[No. 31004-0-II.   Division Two.   November 30, 2004.]

WASHINGTON STATE GEODUCK HARVEST ASSOCIATION, *Appellant*, v. THE DEPARTMENT OF NATURAL RESOURCES, ET AL., *Respondents*.

442

*Aaron K. Owada* (of *Northcraft Bigby & Owada, P.C.*), for appellant.

*Christine O. Gregoire, Attorney General*, and *Michael S. Grossmann, Assistant*, for respondents.

¶1 VAN DEREN, J. — Washington State Geoduck Harvest Association (Association) appeals the trial court's grant of summary judgment in favor of the Department of Natural Resources (DNR) and Douglass Sutherland, Commissioner of Public Lands. The Association argues that DNR has no authority to regulate geoduck harvesting and that DNR regulations for auctioning geoduck harvesting rights (1) violate the public trust doctrine, (2) violate equal protection safeguards, and (3) are inconsistent with RCW 77.04.012. Finding no error, we affirm.

## FACTS

¶2 The Association represents a group of commercial geoduck harvesters. Geoducks are within the class of animals known as mollusks. They are large clams that average two pounds each, that occur naturally along the Pacific

Northwest coast. It takes them four to five years to reach an average harvestable size of one-and-a-half pounds. They burrow into the ocean floor to a depth of as much as three feet and commercial divers harvest them from the beds of the state's navigable waters.

¶3 Unlike other clam resources, the State does not lease lands containing geoducks for long-term cultivation. Instead, it leases tracts of aquatic land yearly until the geoduck resource is harvested down to a set density. The tract is then placed into recovery status, a period that may take from 11 to 42 years. DNR's management plan thus relies on natural replenishment of geoducks to provide sustained harvest opportunities rather than cultivation and enhancement.

¶4 The legislature has authorized DNR to regulate commercial geoduck harvesting in Washington State waters. RCW 79.96.080. DNR implements an established auction process under which geoduck harvesters must comply with numerous requirements prior to and after successfully bidding on harvesting rights.

¶5 RCW 79.96.080 requires that geoducks "be sold as valuable materials under the provisions of chapter 79.90 RCW." Chapter 79.90 RCW outlines DNR procedures and responsibilities for auctioning valuable materials. Interested parties must present a $50,000 deposit to bid on a tract of harvestable ocean bed. The highest bidder at the public auction must then prove itself to be a "responsible bidder" as defined by the statute. RCW 79.90.215. If it satisfies the enumerated criteria, then DNR permits the successful bidder to harvest geoducks from the relevant tract.

¶6 Asserting that DNR's auction process has unlawfully restricted their right to harvest geoducks in Washington, the Association filed a complaint for a declaratory judgment in the superior court. The complaint sought to have RCW 79.96.080 declared invalid under the public trust doctrine and equal protection principles. It also generally challenged DNR's right to manage resources on aquatic lands and

argued that DNR's auction process was inconsistent with RCW 77.04.012.[1]

¶7 The Association and DNR brought cross motions for summary judgment. The court granted DNR's motion and denied the Association's motion for summary judgment.

¶8 The Association then filed this timely appeal, challenging (1) the right of DNR to regulate geoduck harvesting, (2) DNR's methods for regulating geoduck harvesting under the public trust doctrine and equal protection principles, and (3) DNR's use of the procedures under RCW 79.96.080 for commercial geoduck harvesting instead of Department of Fish and Wildlife (DFW)'s general mandate under RCW 77.04.012.

## ANALYSIS

### I. STANDARD OF REVIEW

■ ¶9 We review the trial court's grant of summary judgment in favor of DNR de novo. CR 56(c); *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). We perform the same inquiry as the trial court, considering "only evidence and issues called to [its] attention." RAP 9.12; *see Nelson v. McGoldrick*, 127 Wn.2d 124, 140, 896 P.2d 1258 (1995).

¶10 Summary judgment is proper where there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. *Bishop v. Miche*, 137 Wn.2d 518, 523, 973 P.2d 465 (1999). We consider all facts and reasonable inferences from them in the light most

---

[1] The Association also asserts here, as they did at the trial court, that collateral estoppel mandates that the State treat geoducks as fish instead of "valuable materials" and that DNR's management practices as applied to geoducks are inconsistent with *United States v. Washington*, 873 F. Supp. 1422, 1431 (W.D. Wash. 1994) (treaty right to fish includes the right to harvest shellfish embedded in state aquatic lands). DNR responds, and we agree, that regardless of how case law on treaty rights characterized these resources, RCW 79.96.080 specifies that geoducks are to be sold as "valuable materials" in the manner that other valuable materials are sold—using the sales procedures of chapter 79.90 RCW. We therefore do not further review the Association's collateral estoppel claim.

favorable to the nonmoving party. *Bishop*, 137 Wn.2d at 523.

■ ¶11 Although the Association articulates three challenges to DNR's regulation of geoduck harvesting, resolution of the narrow issue of the facial constitutionality of RCW 79.96.080 under the public trust doctrine and equal protection principles answers all of the Association's claims. Statutes are "presumed constitutional and the burden [falls] on the party challenging the statute to prove its unconstitutionality beyond a reasonable doubt." *Tunstall ex rel. Tunstall v. Bergeson*, 141 Wn.2d 201, 220, 5 P.3d 691 (2000).

## II. DNR's Authority to Regulate Geoduck Harvesting on Public Land

¶12 The Association first argues that because geoducks are not on "state lands" as defined by the public lands act (PLA), state agencies cannot regulate them as "valuable materials." Br. of Appellant at 14. But the Association confuses DNR's authority to regulate resources on state-owned "public lands" with the Act's more limited definition of "state lands."

¶13 Under the PLA, "public lands" include both "state lands" and "aquatic lands." RCW 79.02.010(9). "Aquatic lands" are specifically defined as "all *state-owned* tidelands, shorelands, harbor areas, and the beds of navigable waters as defined in chapter 79.90 RCW that are administered by [DNR]." RCW 79.02.010(1) (emphasis added).[2] DNR has express statutory authority to administer state-owned aquatic lands. RCW 79.90.465(12).

¶14 The PLA acknowledges state ownership of aquatic lands, and directs DNR to manage the resources on that land in the public interest. And the public trust doctrine

---

[2] The Association references the former RCW 79.01.004 (1927) (recodified as 79.02.010, Laws of 2003 ch. 334, § 554), which similarly reads "Public lands . . . include state lands, tidelands, shorelands . . . and the beds of navigable waters belonging to the State."

ensures state management of public lands, in part, through our constitution's express reservation of "the beds and shores of all navigable waters in the state" for state ownership. WASH. CONST. art. XVII, § 1.

¶15 DNR has the authority to sell "valuable materials" on "tide or shore lands belonging to the state." RCW 79.90.090. And geoducks are to be "sold as valuable materials" under the requirements of chapter 79.90 RCW and the PLA. RCW 79.96.080. Thus, DNR may manage and sell geoducks on public lands, which includes state-owned aquatic lands, under chapters 79.02 and 79.90 RCW.

¶16 The Association also contends that geoducks cannot be "valuable materials" under RCW 79.96.080 because they are living creatures and not "materials" in the same sense as the enumerated items in RCW 79.90.060.

¶17 This argument is flawed because RCW 79.96.080 does not state that geoducks "are" valuable materials. The statute states only that they shall be "sold as" valuable materials, with sales regulated under chapter 79.90 RCW. Thus, RCW 79.96.080 references RCW 79.90.060 to invoke the sale requirements of chapter 79.90 RCW, not to equate geoducks with the materials listed in the statute.

III. DNR's AUCTION PROCESS AND THE PUBLIC TRUST DOCTRINE

¶18 The Association argues that DNR's procedures for auctioning harvesting rights under RCW 79.96.080 violate the public trust doctrine. It contends that the doctrine provides a "right to fish" that DNR's sale of geoduck harvesting rights precludes.

¶19 Under the public trust doctrine, DNR must protect various public interests in state-owned tidelands, shore lands and the beds of navigable waters. The traditionally protected interests include commerce, navigation, and commercial fishing. *Orion Corp. v. State*, 109 Wn.2d 621, 641, 747 P.2d 1062 (1987). But our Supreme Court has expanded this list to include " 'incidental rights of fishing, boating, swimming, water skiing, and other related recre-

ational purposes generally regarded as corollary to the right of navigation and the use of public waters.' " *Caminiti v. Boyle*, 107 Wn.2d 662, 669, 732 P.2d 989 (1987) (quoting *Wilbour v. Gallagher*, 77 Wn.2d 306, 316, 462 P.2d 232 (1969)). This necessarily obligates the State to balance the protection of the public's right to use resources on public land with the protection of the resources that enable these activities.

¶20 The principal question is whether the public trust doctrine applies to DNR's sale of commercial geoduck harvesting rights on public lands. We hold that it does.

¶21 The Association argues that DNR's regulation of commercial geoduck harvesting substantially impairs the public's right to use the state land for that purpose. DNR responds that under *State v. Longshore*, the State has the right to sell shellfish embedded in public aquatic lands free from any claims under the public trust doctrine. 141 Wn.2d 414, 5 P.3d 1256 (2000).

¶22 Typically, animals found in the wild are *"ferae naturae,"* indicating that no person owns the animal until it is reduced to possession. *Longshore*, 141 Wn.2d at 421-22. But the sedentary nature of clams and oysters has resulted in statutory and case law that departs from this general rule and distinguishes shellfish because they are " 'so closely related to the soil.' "[3] *Longshore*, 141 Wn.2d at 423 (quoting *Sequim Bay Canning Co. v. Bugge*, 49 Wash. 127, 131, 94 P. 922 (1908)). This divergence is rooted in the perception that the "fixed habitation [of clams] when imbedded in the soil" makes them, "in a very material sense, belong with the land." *State v. Van Vlack*, 101 Wash. 503, 505-06, 172 P. 563 (1918); *Sequim Bay*, 49 Wash. at 131. "In this respect clams differ from fish, game birds and game animals in their wild or natural state." *Van Vlack*, 101 Wash. at 506.

¶23 In *Longshore*, the court considered whether, under Washington law, the public trust doctrine gives the general

---

[3] "Shellfish" are specifically excepted from the definition of "wildlife" in RCW 77.08.010(16).

public a right to take naturally occurring or cultivated clams from property that the State had sold into private ownership. *Longshore*, 141 Wn.2d at 428. It concluded that there is no such right because the clams were bundled with the property owners' land rights.[4] *Longshore*, 141 Wn.2d at 422, 428.

¶24 DNR asserts that *Longshore* is determinative of whether the doctrine provides a public right to harvest geoducks from *state-owned* land. But case law concluding that embedded shellfish " 'belong with' " the land indicates that whether the State or a private entity owns the land is of critical importance in assessing whether the public trust doctrine applies. *Longshore*, 141 Wn.2d at 422 (quoting *Sequim Bay*, 49 Wash. at 131).

¶25 The public trust doctrine "prohibits the State from disposing of its interest in the waters of the state in such a way that the public's right of access is substantially impaired, unless the action promotes the overall interests of the public." *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 232, 858 P.2d 232 (1993) (citing *Caminiti*, 107 Wn.2d at 670).

¶26 Here, the State, not a private party, owns the navigable beds. Thus, DNR has a continuing obligation under the public trust doctrine to manage the use of the resources on the land for the public interest. And *Longshore* is consistent with the conclusion that shellfish embedded on public property are resources that invoke a public right under the public trust doctrine. 141 Wn.2d at 422.

¶27 The United States Supreme Court has indicated that shellfish harvesting is an interest protected by the public trust doctrine. *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 476, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1988) (public lands may be used for shellfish harvesting); *McCready v. Virginia*, 94 U.S. 391, 395-397, 24 L. Ed. 248 (1877) (restrictions on oyster harvesting permitted under

---

[4] The court also reinforced the already settled concept that artificially planted and cultivated clams were the private property of the aquatic land owner. *State v. Longshore*, 141 Wn.2d at 422-23.

concept of state authority to regulate public waters); *Smith v. Maryland*, 59 U.S. (18 How.) 71, 75, 15 L. Ed. 269 (1855).

¶28 But each state individually determines the public trust doctrine's limitations within the boundaries of the state. And state regulation of shellfish harvesting on public land is consistent with our state's protection of commerce, navigation, commercial fishing, and incidental recreational activities. *See Caminiti*, 107 Wn.2d at 670. As a result, the doctrine applies to protect the public interest in harvesting geoducks embedded in the navigable water beds of state-owned lands.[5]

■■ ¶29 Because the public trust doctrine applies, we must determine whether DNR has violated the doctrine through its management regime. We ask: "(1) whether the State, by the questioned legislation, has given up its right of control over the *jus publicum* and (2) if so, whether by so doing the State (a) has promoted the interests of the public in the *jus publicum*, or (b) has not substantially impaired it." *Caminiti*, 107 Wn.2d at 670. We apply heightened scrutiny, as the statutes are essentially being measured against constitutional protections for public access to unique resources. *Weden v. San Juan County*, 135 Wn.2d 678, 698, 958 P.2d 273 (1998).

¶30 In *Caminiti*, the court concluded that the State had not impermissibly given up control of the *jus publicum* by allowing private landowners to build recreational docks in public waters. 107 Wn.2d at 675. There was no significant loss of control because (1) the State had not conveyed title to the land; (2) DNR was authorized to regulate access rights and could revoke dock rights; (3) local regulations governed construction, size, and length of the docks; and (4) the docks had to comply with the Shoreline Management Act of 1971, the hydraulics act, and state flood control laws. *Caminiti*, 107 Wn.2d at 672-73.

---

[5] DNR argues that this conclusion will have wide-reaching implications for private aquaculture activities on state lands. But, as discussed below, the applicability of the public trust doctrine does not open the door for public use if the resource regulation is in the public interest.

¶31 Here, the State allows commercial geoduck harvesting only through specific procedures and requirements that DNR implements and enforces. Under these procedures, no title to state land is conveyed, DNR is responsible for appraising the resources in the water beds, the resource bidders must provide an estimate of resources to be removed, and the State may apply "such terms and conditions deemed necessary . . . to protect the interests of the state." RCW 79.90.310; *see generally* RCW 79.90.180-.310, and Washington State Administrative Code 220-52-019.

¶32 Additionally, DNR has a right to revoke or suspend a commercial harvesting agreement, and the harvester must comply with applicable commercial diving safety standards and federal occupational safety and health administration regulations. RCW 79.96.080. Thus, under the relevant statutory framework, the State has not given up its right of control over the state's geoduck resources.

¶33 Further, the state's action is improper only where it does not promote, or where it substantially impairs, the public interest. Here, the opposite is true.

¶34 The public trust doctrine, as applied to DNR's regulation of commercial geoduck harvesting, protects the public right to recreation, commerce, and commercial fishing, all of which are bolstered by the state's system of facilitating sustainable geoduck harvesting and natural regeneration of the resource. And the proceeds from the sale of harvesting rights go to support aquatic resource management and enhancement of aquatic lands for all uses by the public. RCW 79.90.245; RCW 79.96.080. Thus, DNR's procedures and regulation of commercial geoduck harvesting serves the public, satisfies the public trust doctrine's requirements, and is not an unconstitutional infringement on the public's rights.

IV. EQUAL PROTECTION PRINCIPLES

¶35 The Association next argues that RCW 79.96.080 is unconstitutional because it violates equal protection principles. But these protections do not apply where the challenged law does not create a suspect class of persons. *Neah Bay Chamber of Commerce v. Dep't of Fisheries*, 119 Wn.2d 464, 476, 832 P.2d 1310 (1992).

¶36 Article I, section 12 of the Washington Constitution requires that no law grant "any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations." And neither RCW 79.96.080 nor any statute it references singles out any group of persons for distinct treatment. RCW 79.96.080.

¶37 The Association in essence asserts that because commercial geoduck harvesting is regulated differently from other fish and shellfish harvesting, the equal protection clause is implicated. But geoducks are not citizens and are not protected by our constitution's equal protection clause. *See Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1179 (9th Cir. 2004).

¶38 Even expanding the Association's argument to assert differential treatment of geoduck harvesters from other shellfish harvesters, its claim is unsuccessful. The challenged statute applies only to geoduck harvesting, does not create classes of harvesters, and, thus, does not trigger equal protection principles. RCW 79.96.080.

V. DNR's GEODUCK HARVESTING PROCEDURES AND RCW 77.04.012

¶39 The Association asserts that DNR's geoduck management does not comply with RCW 77.04.012 because it fails to "maintain the economic well-being and stability of the fishing industry." RCW 77.04.012. This statute provides a set of general management objectives for the Fish and Wildlife Commission, its director, and DFW to guide their

454

management of wildlife, fish "and shellfish in state waters and offshore waters." RCW 77.04.012.

¶40 But the statutes clearly separate the obligations of DFW and DNR. Chapter 77.04 RCW establishes the responsibilities of DFW. RCW 77.04.012 does not control DNR's regulation of commercial geoduck harvesting under RCW 79.96.080. Under RCW 77.60.070(1), DFW "may not authorize a person to take geoduck clams for commercial purposes outside the harvest area designated in a current [DNR] geoduck harvesting agreement issued under RCW 79.96.080." RCW 79.96.080 is a specific directive that requires DNR to regulate the sale of geoducks, and allows DNR to "place terms and conditions in the harvesting agreements as [it] deems necessary."

¶41 For these reasons, we need not consider DNR's compliance with chapter 77.04 RCW.

¶42 Finding no error, we affirm the trial court.

MORGAN, A.C.J., and ARMSTRONG, J., concur.