[No. 78628-3.    En Banc.]

Argued May 24, 2007.    Decided September 13, 2007.

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS JOHN MARTIN TOBIN, *Petitioner*.

518

*Reed Manley Benjamin Speir*, for petitioner.

*Gerald A. Horne, Prosecuting Attorney*, and *Michelle Luna-Green, Deputy*, for respondent.

*Robert M. McKenna, Attorney General*, and *Joseph V. Panesko, Assistant*, on behalf of Department of Natural Resources, amicus curiae.

¶1 BRIDGE, J. — Douglas Tobin pleaded guilty to illegally harvesting large amounts of crab and geoduck from Puget Sound. The victims were the State and the Puyallup, Squaxin, and Nisqually tribes. The trial court ordered Tobin to pay restitution for, among other things, the State's extraordinary investigative and administrative costs and the cost of resurveying impacted geoduck tracts. Tobin now argues that these costs were not sufficiently related to his crimes to justify their inclusion in his restitution. However, these costs were caused by Tobin's criminal activity, and

Tobin has not shown that the trial court abused its discretion. We affirm the Court of Appeals.

I

Facts and Procedural History

¶2 Between January 2000 and March 2002, Douglas Tobin ran an organization that illegally harvested crab and geoduck from Puget Sound. Tobin and his employees would operate his boat at night without lights to avoid being detected. Divers harvested geoduck and the crew set illegal traps for crab. Tobin would transport the stolen seafood from his boat to his packing plant where he would package the geoducks and crab and sell them to various seafood processors in Canada, California, and Washington.

¶3 Tobin was charged under three separate cause numbers. *State v. Tobin* (Pierce County Super. Ct., Wash. (Apr. 20, 2004)). In the geoduck case (No. 02-1-05810-0), he was originally charged with 39 counts, including 1 count of leading organized crime, 10 counts of trafficking stolen property, 27 counts of theft in the first degree, and 1 count of conspiracy to commit theft. After extended plea negotiations, the State reduced the geoduck charges to one large count of theft in the first degree.

¶4 In the crab case (No. 02-1-01236-3), there were originally 120 counts, including 34 counts of unlawful trafficking of fish or wildlife, 33 counts of violating commercial fishing areas or times, 12 counts of possessing shellfish without a health certificate, 33 counts of failing to report fish tickets, 1 count of fish dealing without a license, and 1 commercial fishing violation. The State reduced the crab case to 33 counts of trafficking in fish or wildlife, 1 count of fish dealing without a license, 1 count of violating commercial fishing areas or times, 1 count of possessing shellfish

without a health certificate, and 1 count of failure to report fish tickets.[1]

¶5 Tobin pleaded guilty to the amended charges as described above, but everyone agreed a hearing would be necessary to set restitution. The parties also agreed that the State would request an exceptional sentence not to exceed 19 years and 8 months. For the geoduck case, Tobin was sentenced to 168 months (14 years) of total confinement, and for the crab case, he was sentenced to 12 months of total confinement.

¶6 At the restitution hearing, the State presented evidence gathered from paperwork seized from Tobin's packaging plant. Fish and wildlife agents were able to determine to whom Tobin had sold the illegally harvested geoducks and crab. Agents then obtained warrants for the records of those businesses. Using various air bills, invoices, fish tickets, checks, and deposit records, a forensic accountant was able to estimate the amounts of geoduck and crab that were illegally harvested. The accountant's analysis conservatively estimated that Tobin stole 196,412 pounds of geoduck and 73,615 pounds of crab. *State v. Tobin*, 132 Wn. App. 161, 169, 130 P.3d 426 (2006).

¶7 For the geoduck case, the State requested $1,272,846, the minimum Tobin received from selling the illegal geoduck. The State also argued that Tobin should have to pay $317,000 for the time various detectives spent on the case, $19,250 for the time that officers spent executing warrants, $15,000 for the cost of hiring a part time assistant to manage the voluminous documentary evidence, $30,000 for the cost to hire the forensic accountant, $1,500 to send a detective to California to serve warrants, $70,000 for the cost to resurvey illegally harvested, underwater geoduck tracts, and $10,000 to store evidence, including boats, vehicles, and crab pots. The State requested that the court order a total of $1,735,596 in restitution in the geoduck case.

---

[1] The final case, not at issue here, involved one count of unlawful possession of a firearm.

¶8 For the crab case, the State requested $198,305.20 for the crab that Tobin stole. The State also requested $42,000 for the cost of three patrol boats and their crews to collect crab pots that Tobin left at the bottom of Puget Sound. Those boats recovered approximately 100 pots. Finally, the State requested $7,500 for the cost of side scan sonar needed to locate the crab pots.

¶9 The trial court made a meticulous and thorough review of the evidence presented. The court ordered restitution in the amount of $879,408.40 in the geoduck case, approximately $850,000 less than the State had requested. The calculation included $764,408 for the geoducks, reflecting the amount of loss to the State rather than the amount that Tobin profited. Because the State was a victim, the trial judge also ordered Tobin to pay the cost of the forensic accountant ($30,000), the additional part time assistant needed to manage records ($15,000), and the cost of resurveying the affected geoduck tracts ($70,000). But the trial court did not include the ordinary investigation costs incurred by detectives. The court also ordered that once paid, distribution of funds among the victims, namely the State and the tribes, would be allocated according to their negotiations.

¶10 The trial court also ordered Tobin to pay $247,803 of restitution in the crab case. This included $198,350.20 for the value of the crab, $42,000 for crab pot collection, and $7,500 for sonar to locate the crab pots. Again, the restitution, once paid, would be distributed between the State and the affected tribes according to negotiations.

¶11 Tobin appealed the restitution order, but the Court of Appeals affirmed. *Tobin*, 132 Wn. App. at 181. Tobin filed a petition for review in this court, raising a variety of issues. We granted review only on the issue of "whether the investigative, administrative, and environmental costs included in the restitution award were sufficiently related to petitioner's crime." Wash. State Supreme Court Order, 2007 Wash. LEXIS 142, at *1 (Mar. 7, 2007).

## II

### Analysis

■■ ¶12 A trial court's order of restitution will not be disturbed on appeal absent abuse of discretion. *State v. Enstone*, 137 Wn.2d 675, 679, 974 P.2d 828 (1999). However, application of an incorrect legal analysis or other error of law can constitute abuse of discretion. *See State v. Kinneman*, 155 Wn.2d 272, 289, 119 P.3d 350 (2005).

■ ¶13 We have recognized that the authority to order restitution is derived entirely from statute. *State v. Smith*, 119 Wn.2d 385, 389, 831 P.2d 1082 (1992). The relevant portions of RCW 9.94A.753 provide that restitution "shall be based on easily ascertainable damages for injury to or loss of property," and "[t]he amount of restitution shall not exceed double the amount of the offender's gain or the victim's loss from the commission of the crime." RCW 9.94A.753(3).

> Restitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property . . . unless extraordinary circumstances exist which make restitution inappropriate in the court's judgment and the court sets forth such circumstances in the record.

RCW 9.94A.753(5). If pursuant to a plea agreement, some offenses are not prosecuted, the prosecutor and the defendant can agree that restitution will also be ordered for uncharged offenses. *Id.*

> This section does not limit civil remedies or defenses available to the victim, survivors of the victim, or offender . . . . The state or victim may enforce the court-ordered restitution in the same manner as a judgment in a civil action.

RCW 9.94A.753(9).[2]

---

[2] In addition, where criminal profiteering is involved, the attorney general or a county prosecutor may, on behalf of the State, file an action in superior court for

¶14 Thus, the plain language of the restitution statute allows the trial judge to order restitution ranging from zero in extraordinary circumstances, up to double the offender's gain or the victim's loss. RCW 9.94A.753(3); *Kinneman*, 155 Wn.2d at 282. The amount of restitution shall be based on "easily ascertainable damages." RCW 9.94A.753(3). When interpreting Washington's restitution statutes, we recognize that they were intended to require the defendant to face the consequences of his or her criminal conduct. *State v. Davison*, 116 Wn.2d 917, 922, 809 P.2d 1374 (1991). We do not engage in overly technical construction that would permit the defendant to escape from just punishment. *Id*. The legislature intended "to grant broad powers of restitution" to the trial court. *Id*. at 920.

¶15 Absent agreement from the defendant as to the amount of restitution, the State must prove the amount by a preponderance of the evidence. *State v. Hughes*, 154 Wn.2d 118, 154, 110 P.3d 192 (2005), *overruled on other grounds by Washington v. Recuenco*, 548 U.S. 212, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006). Restitution is allowed only for losses that are "causally connected" to the crimes charged. *Kinneman*, 155 Wn.2d at 286. Yet, we have held that foreseeability is not required. *Enstone*, 137 Wn.2d at 682-83. In *Kinneman*, we approved the Court of Appeals' application of a "but for" inquiry to determine causation. *Kinneman*, 155 Wn.2d at 287-88; *see also State v. Hiett*, 154 Wn.2d 560, 566, 115 P.3d 274 (2005) (employing a "but for" analysis).

¶16 "[F]unds expended by a victim as a direct result of the crime (whether or not the victim is an 'immediate' victim of the offense) can be a loss of property on which restitution is based." *Kinneman*, 155 Wn.2d at 287; *see also Smith*, 119 Wn.2d at 388. For example, where the defendant was an attorney convicted of stealing from his clients

the recovery of damages and costs, "including reasonable investigative and attorney's fees." RCW 9A.82.100(1). The definition of "criminal profiteering" includes theft as defined in RCW 9A.56.030. RCW 9A.82.010(4)(e).

and the victim had to pay attorney fees to obtain any recovery in the civil suit, the victim's attorney fees from the civil suit could be calculated as part of restitution. *Kinneman*, 155 Wn.2d at 288 (discussing *State v. Christensen*, 100 Wn. App. 534, 997 P.2d 1010 (2000)). On the other hand, where the defendant was convicted of custodial interference, travel costs associated with finding the child and returning him home were appropriately considered part of restitution, but attorney fees connected with the victim's representation in a separate visitation action were not sufficiently causally related to the crime. *Id.* at 289 (discussing *State v. Vinyard*, 50 Wn. App. 888, 894, 751 P.2d 339 (1988)).

¶17 Aside from attorney fees incurred in some related civil proceedings, other costs resulting from a defendant's crime have been included in restitution orders. For example, we have allowed restitution to include investigative costs that are " 'reasonably and rationally related to the crime and consequential in the sense that but for the [crime], the victim would not have incurred them.' " *Kinneman*, 155 Wn.2d at 287 (alteration in original) (quoting *State v. Wilson*, 100 Wn. App. 44, 50, 995 P.2d 1260 (2000)). Thus, costs incurred by a bank to unload surveillance film, to purchase new film, and to reload bank surveillance cameras were properly included in restitution. *Smith*, 119 Wn.2d at 388. The "funds spent by the bank were 'property' that was lost as a direct result of the crime." *Id.* at 389-90. The costs of investigating embezzlement have also been deemed proper restitution. *Kinneman*, 155 Wn.2d at 287-88 (discussing *Wilson*, 100 Wn. App. at 50); *State v. Johnson*, 69 Wn. App. 189, 193, 847 P.2d 960 (1993). We have even allowed restitution to include the amount that a city paid an assault victim during the time that he was unable to work as a result of the assault, even though the city was not the direct victim of the crime and even though the city was not required to pay the victim during his time away from work. *Davison*, 116 Wn.2d at 921-22.

¶18 Furthermore in *Hughes*, where the crime involved a loss of environmental resources, we affirmed a restitution

order that included the real ecological value, rather than simply market value, of stolen old growth trees. *Hughes*, 154 Wn.2d at 155. In doing so, we relied on the legislature's definition of "restitution," which includes both private and public costs. *Id.*; RCW 9.94A.030(38). And because a forest expert testified to the value of the stolen trees, the State proved the amount of loss beyond mere speculation or conjecture. *Hughes*, 154 Wn.2d at 155.

¶19 In addition to cases from this court, the Court of Appeals has, at various times, evaluated the causal connection between a crime charged and restitution ordered. In some cases, the Court of Appeals found that the restitution was unrelated to the *specific crime charged. E.g.*, *State v. Dauenhauer*, 103 Wn. App. 373, 379-80, 12 P.3d 661 (2000) (defendant was charged only with burglary, but his restitution included damages incurred in a car accident that occurred during his attempted escape). In other cases, the Court of Appeals has determined that the proof submitted did not sufficiently establish that the charged crime caused the *specific* damages claimed. *State v. Dennis*, 101 Wn. App. 223, 227-28, 6 P.3d 1173 (2000) (for one victim, the State failed to explain when and why listed medical services were provided); *State v. Hahn*, 100 Wn. App. 391, 399-400, 996 P.2d 1125 (2000) (charged amounts not linked to specific symptoms or treatments); *State v. Dedonado*, 99 Wn. App. 251, 257, 991 P.2d 1216 (2000) (causal connection is not established simply because the victim or insurer submits a list of expenditures, without more). But where the charged crime caused the claimed damages, the Court of Appeals has not hesitated to order appropriate restitution. *State v. Lohr*, 130 Wn. App. 904, 909-10, 125 P.3d 977 (2005) (where defendant recklessly left a candle burning in her hotel room, restitution could include cars destroyed by the resulting fire). In evaluating the causal connection, the Court of Appeals has asked whether, "but for" the crime, the damages would have occurred. *Id.*

¶20 In sum, costs that a victim incurs as the result of the defendant's crimes have been deemed a loss of property

under the restitution statute, and the trial court enjoys broad discretion in determining the amount of restitution. There must be a causal connection between the damages claimed and the crime charged. The Court of Appeals has required only a determination that "but for" the crime, the damages would not have occurred, and we have made it clear that foreseeability is not required. In application, we have approved restitution orders that cover investigative costs and ascertainable environmental costs, in part because public costs are included in the definition of restitution.

¶21 Tobin asserts that "[i]t was error for the court to include investigative, staff support costs, and survey costs as special damages for the restitution for the geoduck offense because the State did not prove the costs and because the costs were not sufficiently related to Mr. Tobin's actions." Pet. for Review at 15. We granted review only on the issue of whether the investigative, administrative, and resurveying costs included in Tobin's restitution order *were sufficiently related* to Tobin's crimes. Order, 2007 Wash. LEXIS 142, at *1.[3] The grant of review does not include whether the State presented sufficient evidence that the asserted costs were actually incurred. Moreover, Tobin did not object below to the sufficiency of the State's evidence that the costs were incurred.

■ ■ ¶22 *State's Costs To Reconstruct Tobin's Accounting.* Because Tobin did not keep records of his illegal transactions, the State had to hire a forensic accountant and a part time assistant in order to determine the actual loss the State suffered as the result of Tobin's illegal harvesting. The State had to rely on shipping air bills and the records of the various markets that received Tobin's geoduck and crab. Geoduck Clerk's Papers (CP) at 125-26.

---

[3] In his briefing both here and at the Court of Appeals, Tobin focuses on the State's discussion of the $317,000 spent to pay detectives for their work investigating Tobin. Geoduck Clerk's Papers at 73; Opening Br. of Appellant at 12-13; Pet. for Review at 15-16. Though the State included those costs in its briefing for the restitution hearing, the trial court declined to award them, and therefore the restitution calculation did not include funds to cover the salaries of detectives working on the case. Report of Proceedings at 34 (Apr. 9, 2004).

The State then had to work backward to calculate the amounts of crab and geoduck that were stolen. *Id*. at 92-95. The breadth and detail of the accountant's work and the complexity of the evidence are reflected in the record, which includes 20 pages of detailed accounting. *Id*. at 95-115. The forensic accountant charged the State $30,000 for his services in this case, and the part time assistant was paid $15,000 to organize and manage the documentary evidence. *Id*. at 126-27. The trial court included these costs in Tobin's restitution.

¶23 We have acknowledged that a victim's costs incurred to investigate embezzlement can be properly included in the defendant's restitution calculation. *Kinneman*, 155 Wn.2d at 288-89 (discussing *Wilson*, 100 Wn. App. at 50); *see also Johnson*, 69 Wn. App. at 194-95. The extraordinary investigation costs incurred in piecing together this complex criminal scheme should not be treated differently. The costs of the forensic accountant and assistant are State funds that were lost as a direct result of Tobin's crimes. *See Smith*, 119 Wn.2d at 389-90. We conclude that the $30,000 cost for the forensic accountant and the $15,000 for the assistant in this case were properly included in Tobin's restitution.

¶24 *Survey Costs*. Without detailed argument, Tobin also asserts that the $70,000 cost of resurveying of illegally harvested geoduck tracts was not sufficiently related to his crime to warrant inclusion in his restitution calculation. The State contends that the cost to resurvey the illegally harvested geoduck tracts was a direct result of Tobin's crimes.

¶25 Geoduck clams can live up to 164 years, and they have a low natural mortality rate of one to four percent per year. Geoduck CP at 83-84. Unlike other clams, the State management plan for geoduck relies on natural replenishment, rather than cultivation, to provide sustained harvest opportunities. *Wash. State Geoduck Harvest Ass'n v. Dep't of Natural Res.*, 124 Wn. App. 441, 445, 101 P.3d 891 (2004). When 200,000 pounds of geoduck are harvested, it takes an

average of 39 years to recover a similar amount of geoduck through natural reproduction. Geoduck CP at 84. Scientists at the Washington Department of Fish and Wildlife have developed an equilibrium yield model to calculate a sustainable harvest rate, which they have determined to be 2.7 percent of the geoduck biomass. *Id.*

¶26 The legislature has authorized the Department of Natural Resources to regulate commercial geoduck harvesting. RCW 79.135.210. By statute, the State enters into harvesting agreements with harvesters, who must comply with numerous requirements prior to and after successfully bidding on harvesting rights for a particular tract of geoduck beds. RCW 79.135.210; *Geoduck Harvest Ass'n*, 124 Wn. App. at 445. State and tribal fisheries managers have agreed to maintain a long-term sustainable geoduck fishery. Geoduck CP at 84. Accordingly, geoduck harvesting is rigorously managed. Quotas are set according to the adopted 2.7 percent harvest rate. *Id.* Harvests are accounted for through official tracking of fish tickets. *Id.* at 85. And the State and tribes have agreed that "any overharvest will result in 'payback' to the resource by reducing harvest shares in the next management period." *Id.*

¶27 Illegal harvest of geoduck upsets this delicate balance:

> Illegal harvest of geoduck clams results in an immediate loss of spawning biomass which has not been accounted for in the state/tribal harvest quotas. To the extent that the illegal harvest results in overharvest of quota shares, the harvest rate is above the sustainable harvest level. When the reduction of biomass goes unreported, as is the case with illegal harvest, the problem it creates is compounded each year that it goes undetected. This is because the harvest rate of 2.7% is applied to a geoduck biomass estimate [based] on **reported** landings (i.e. accurately recorded on fish receiving tickets). When illegal harvest occurs, one will falsely believe that the biomass is greater than it actually is.

*Id.* There are, therefore, two problems created by illegal harvest. First, the combination of legal and illegal harvest

constitutes more than the sustainable 2.7 percent. *Id.*
Second, the scientists calculating quotas overestimate the
population to which the 2.7 percent limit is applied. *Id.*

¶28 In the areas where Tobin illegally harvested, new
surveying must be done to determine the existing biomass
before accurate quotas can be set at sustainable levels. *Id.*
at 88. The declaration of a Department of Fish and Wildlife
biologist lists the location of the 1,192 acres where illegal
harvesting occurred and explains that resurveying these
areas will take 89 days of work by two dive teams at the cost
of $792 per day. *Id.* The State requested and the trial court
granted $70,000 to cover these expenses. *Id.*; Report of
Proceedings (RP) at 34-38 (Apr. 9, 2004).[4] The State owns
the navigable geoduck beds, and the Department of Natural
Resources has a continuing obligation to manage the use of
the resources on the land for the public interest. *Geoduck
Harvest Ass'n*, 124 Wn. App. at 450. In order to sustain the
fishery, the State must guard against overfishing. As a
direct result of Tobin's illegal conduct, the State must
resurvey in order to determine the status of the geoduck
tracts from which he illegally harvested. Geoduck CP at 88.
Otherwise, the impact of Tobin's illegal harvesting cannot
be accurately known, and if his harvesting is underesti-
mated, overfishing will continue. Tobin has not suggested
an alternative means by which the State could arrive at an
accurate quota that accounts for the geoduck loss. Thus, the
need to resurvey is a direct, and even foreseeable, cost of
Tobin's crimes.

¶29 This court has previously recognized that restitution
can include repayment of public costs resulting from the
environmental harm caused by the defendant's illegal con-
duct. *Hughes*, 154 Wn.2d at 155. We conclude that Tobin
has failed to show that the trial court abused its discretion

---

[4] The biologist's declaration also explains that a 19-year study of select tracts
was impacted, requiring $29,000 of resurveying on those tracts. Geoduck CP at
88-90. But the State did not request that the $29,000 loss be included in
restitution and the trial court did not order it. RP at 35-36 (Apr. 9, 2004).

when it included the cost of resurveying in his restitution calculation.[5,6]

¶30 In sum, we affirm the Court of Appeals.[7] We conclude that the trial court did not abuse its discretion when it included extraordinary investigative, administrative, and resurveying costs in Tobin's restitution calculation.

## III

## Conclusion

¶31 This court granted review only on the issue of "whether the investigative, administrative, and environmental costs included in the restitution award were sufficiently related to petitioner's crimes." Order, 2007 Wash. LEXIS 142, at *1. We affirm the Court of Appeals and conclude that the trial court did not abuse

---

[5] We note that a civil action is an available mechanism for the State to recover the costs of the resurvey. *See State v. Fleming*, 75 Wn. App. 270, 275, 877 P.2d 243 (1994). RCW 9A.82.100(1) allows the attorney general or a county prosecutor to file a civil suit to recover loss, including investigative costs and attorney fees, in cases involving criminal profiteering. But where the State is a victim, our restitution scheme also allows the State to recover costs that are causally connected to the defendant's criminal acts. Thus the potential availability of a civil suit does not overcome the application of the restitution statutes in this case.

[6] *Costs To Recover Crab Pots.* Tobin's petition for review does not explicitly challenge the State's cost of locating and recovering the crab pots that Tobin left in the Nisqually area of Puget Sound. Pet. for Review at 15-16. Because Tobin does not challenge this portion of his restitution, we need not discuss it. Suppl. Br. of Resp't at 5-6; Pet. for Review at 14-16. Even if Tobin were to challenge these costs, the recovery of the illegally set pots was necessary because if left unrecovered, they would continue to trap crab, a scarce public resource in the Nisqually area. *See* Geoduck CP at 124 (describing strings of up to 120 pots that Tobin illegally used in the Nisqually reach). Thus, the need to recover the illegal crab pots was a direct result of Tobin's crime. *See Smith*, 119 Wn.2d at 389-90.

[7] In his petition for review, Tobin also argues that the declarations submitted in support of the awarded investigative and administrative costs were insufficient because they did not include the place of execution. However, Tobin submitted this argument as a separate ground for review and we did not grant review on this issue. Pet. for Review at 16-20; Order, 2007 Wash. LEXIS 142, at *1. Moreover, we have "applied substantial compliance principles when deciding cases involving defective affidavits." *Crosby v. Spokane County*, 137 Wn.2d 296, 302, 971 P.2d 32 (1999).

its discretion when it included extraordinary investigative, administrative, and resurveying costs in Tobin's restitution. These costs were sufficiently causally connected to Tobin's criminal activity to warrant inclusion in his restitution obligation.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, SANDERS, CHAMBERS, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.