IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74672-3-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| MATTHEW TRAVIS GONCE, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 16, 2017 |

SCHINDLER, J. — When an offender is convicted of a crime that results in injury to the victim, the court shall order restitution for reasonably ascertainable medical expenses and lost wages. Matthew Travis Gonce pleaded guilty to malicious and intentional felony harassment of University of Washington Medical Center Patient Service Specialist Carol Harris and intentional assault in the fourth degree of Registered Nurse Rebekah Strong. The court ordered restitution to the Washington State Department of Labor and Industries (L&I) for medical expenses and lost wages. Gonce contends the court did not have the statutory authority to order restitution for lost wages for emotional distress caused by the felony harassment of Harris and assault of Strong. Gonce claims the statute allows restitution for lost wages resulting only from physical injury, not emotional distress. We hold the restitution statute does not limit restitution to lost wages resulting from only physical injury. The plain and unambiguous language of

the statute authorizes the court to order reasonably ascertainable restitution for lost wages resulting from emotional distress. We affirm the order of restitution.

## FACTS

The material facts are not in dispute. On December 4, 2014, the University of Washington (UW) Medical Center admitted Anna Whittington for pregnancy complications. Whittington was approximately eight months pregnant.

Registered Nurse Rebekah Strong noticed a white male, later identified as Matthew Travis Gonce, come out of a patient room "mumbling under his breath about bitches." Gonce looked at Strong and said, " 'And here's a bitch right here.' " Strong told him, " 'Please don't use that language towards me' " and continued to walk past Gonce. Gonce "smacked" Strong on her "butt extremely hard" with his open hand. Strong said the sound from hitting her was "very loud" and she "saw other people towards the front of the desk look to see what had happened." Strong said, "It was upsetting; it was painful; it was embarrassing. It was pretty shocking, and it was very disruptive."

Strong said Gonce started "ripping everything off the walls" in the hallway and throwing equipment to the ground.

> [H]e was ripping everything off the walls, and any kind of equipment that was in the hallway he started throwing to the ground. And we have some mounted, like, things on the walls, and he was even ripping those off.

Strong saw UW Security Officer Brian Zick down the hall, screamed for help, and called 911.

Meanwhile, Gonce shoved an Asian housekeeper, knocking over her cart in the hallway, and yelled at her, " 'Gook, get out of here, you gook. You don't belong in this

country. If you're not white, you're not right. You gook, get out of here.' " Gonce "motioned his finger like it was a gun" and threatened to " 'shoot this MF — I'm going to — everybody going to die today. Pow; you dead. Pow; you dead.' "

Gonce entered the sixth-floor staff room. He yelled obscenities, "grabbed items off the center table," and "threw them on the ground." Gonce tried to attack a doctor but Strong "distracted him and told the doctor to run." Outside the staff room, doctors and nurses were "running up and down the hall, people closing their doors and screaming and hollering."

After Gonce left the staff room, he approached the front desk area, yelling obscenities. When Gonce saw UW Medical Center Patient Service Specialist Carol Harris, he yelled at her, " 'What are you looking at, you nigger? You nigger bitch. You nigger whore. I hate niggers. I hate you, nigger.' " With his hand in the shape of a gun, Gonce threatened to kill Harris because she was black: " 'Nigger bitch, I'm going to rip out your hair weaves and kill you.' " Gonce ran toward the front desk and lunged at Harris. A coworker intervened and pushed Gonce away. Harris ran out of the area, slamming her shoulder on the doorjamb as she left. Gonce violently grabbed the computer monitor Harris was using, ripped it off the front desk, and threw it on the ground with the "wires . . . hanging" out. As Harris was running away, she saw "a lot of people that responded to come for help." Harris told a black woman who came to help, " '[T]he sight of black people right now is what's aggravating him. So don't go — don't go. Please don't go.' "

Whittington came out of the patient room and yelled at Gonce to stop. Gonce attacked her. Gonce grabbed Whittington by the hair and placed his arm around her

neck. With his hand in the shape of a gun, Gonce dragged Whittington down the hallway, shouting that he was going to "shoot his bitch down."

Security Officer Zink tried to stop Gonce. Gonce knocked Officer Zink down and swung a mop at him. With the help of hospital staff, Officer Zink was able to restrain Gonce until the UW police arrived. While several police officers held Gonce down, he continued to try to get away, repeatedly saying, " 'I'm going to kill all you niggers. I hate you. Go back to where you come from. You don't belong in this country. Get out of here, nigger, nigger, nigger.' "

Harris went to the UW Medical Center Emergency Room that day for her injured shoulder. A security officer warned Harris that Gonce was in a patrol car parked outside the emergency room. When Harris saw Gonce "staring at me," she left and decided to see a doctor later.

Harris was not scheduled to work the next two days. Harris returned to work on December 6. Gonce "showed up" to visit Whittington. Medical center staff called security and sent Harris home. Harris went to urgent care for her shoulder injury. Urgent care referred Harris to Dr. Timothy Gilmore. Harris saw Dr. Gilmore on December 11.

Harris did not work from December 6, 2014 until she was released by her doctor to return to work on January 26, 2015. Because Whittington was still a patient at the UW Medical Center in Seattle, the UW transferred Harris to the Bellevue clinic to avoid any contact with Gonce. Harris worked a reduced schedule at the Bellevue clinic from January 26 until March 22, 2015. Harris engaged in counseling three times a week for a year. The counseling sessions addressed post-traumatic stress disorder.

Strong went to her primary care doctor about anxiety caused by the attack. Strong was having difficulty sleeping and was "jumpy" at work. Her doctor instructed her not to work for at least one week. Strong did not work from December 18 until December 28. Strong also engaged in counseling.

Harris and Strong filed claims with the Washington State Department of Labor and Industries (L&I) and submitted documentation for medical expenses and time loss from work resulting from emotional distress. L&I paid Strong $240.18 for medical treatment and counseling and $1,491.60 for lost wages, totaling $1,731.78. L&I paid Harris $3,450.36 for medical treatment and counseling and $5,115.69 for lost wages, totaling $8,566.05.

The State charged Gonce with malicious and intentional felony harassment of Harris, intentional assault in the fourth degree of Strong, and domestic violence intentional assault in the fourth degree of Whittington. Gonce pleaded guilty to malicious and intentional felony harassment of Harris in violation of RCW 9A.36.080(1) and intentional assault in the fourth degree of Strong and Whittington in violation of RCW 9A.36.041.

Gonce admitted he "maliciously and intentionally threatened Carol Harris because of . . . her race."

> On or about December 4, 2014, in King County, WA, I maliciously and intentionally threatened Carol Harris because of my perception of her race and placed her in reasonable fear of her or her property when I yelled I hated niggers and threw the hospital reception computer near Ms. Harris on the ground.

Gonce admitted he "intentionally assaulted Rebekah Strong when I smacked her" and

intentionally assaulted Whittington "when I pushed her."

> On December 4, 2014, in King County, WA, I intentionally assaulted Rebekah Strong when I smacked her as she walked by. On the same date and in the same location, I intentionally assaulted Anna Gonce aka Anna Whittington when I pushed her. Ms. Gonce and I were in a romantic dating relationship at the time.

Gonce states his "consumption of marijuana laced with PCP[1] substantially contributed to my behavior."

As part of the plea agreement, Gonce stipulated to the "real and material facts" set forth in the certification for determination of probable cause and the summary of the prosecutor. Gonce agreed to pay restitution "in full" to Harris and Strong "for all losses."

The court imposed a first time offender sentence for the crime of felony harassment. The court ordered 60 days of work/education release and 12 months of community custody subject to mental health treatment. The court prohibited Gonce from possessing weapons and nonprescription drugs. The court imposed a concurrent 60-day sentence for the misdemeanor assaults. The court imposed a 5-year order for no contact with Harris, Strong, and the UW Medical Center. The judgment and sentence states the amount of restitution would be determined following a hearing.

L&I requested $10,297.83 in restitution for payments made to Harris and Strong for medical expenses, counseling, and lost wages resulting from emotional distress caused by the felony harassment and assault: $1,731.78 for "time loss ($1,491.60) and medical services ($240.18)" paid to Strong and $8,566.05 for "time loss ($5,115.69) and medical services ($3,450.35)" paid to Harris. In support of the request, L&I submitted L&I payment documentation and ledgers.

---

[1] Phencyclidine, also known as "angel dust."

Strong, Harris, and L&I Claim Manager Sandra Chey testified at the restitution hearing. The court admitted into evidence medical reports and the L&I documentation and ledgers.

Strong testified the attack was "shocking" and "upsetting." Strong said she had trouble sleeping and attended "[m]ore than one" counseling session. Strong said she was "extremely anxious" and "very distracted and jumpy at work." Strong testified her doctor recommended she take at least one week off work due to her "emotional . . . state."

Harris testified the racial threats Gonce made to kill her were "very upsetting" and continued to affect her.

Q.      Did . . . the stress of that event continue in your life after December 4th, 2014?
A.      The stress of that event is continuing even now —
Q.      All right.
A.      — because I can't — it's hard to concentrate. Something broke inside — I'm a very strong person — and I knew it. I even try to encourage other people, but something inside of me broke. Right now, I'm shaking inside.

Harris testified she "tried really hard" to return to work at the UW Medical Center in Seattle after December 4 but could not because Gonce kept returning.

Q.      Okay. Now, when you . . . returned to work a few days after December 4th, 2014, and you were able to work. But it wasn't until you heard that . . . Mr. Gonce had returned to the hospital that you decided to take more time off; is that correct?
A.      That is incorrect. When I returned to work, I returned to work to try to work, to face the demons, to get my life back. It is fair to say that when I went back to work I was not able to work a whole day. Twice, I went home, I couldn't stay, because he was there and the fear — what I felt inside was — felt like something was exploding inside. So it's fair to say that I tried really hard, but I couldn't do it.

7

L&I Claim Manager Chey testified that L&I paid lost wages for Strong from December 18 to December 28, 2014. L&I paid lost wages for Harris from December 6, 2014 to January 26, 2015 and lost wages for working less than full time from January 26 to March 22, 2015.

Gonce did not object to restitution for medical expenses and counseling. Gonce objected to restitution for lost wages. Gonce argued the restitution statute allowed the court to order restitution for lost wages resulting from only physical injury, not emotional injury. The court disagreed. The court found the State met its burden of establishing ascertainable restitution for lost wages resulting from injury. In addition to medical and counseling expenses, the court ordered restitution of $1,491.60 for lost wages L&I paid Strong, totaling $1,731.78. In addition to medical and counseling expenses, the court ordered restitution of $4,204.63 for lost wages L&I paid Harris from December 2014 to February 2015, totaling $7,654.99. The court did not order Gonce to pay restitution for Harris' lost wages in March. Because the record showed Whittington was no longer a patient at the UW Medical Center in March 2015, the court found Harris could have returned to her job in March at the UW Medical Center in Seattle.

## ANALYSIS

Gonce contends the court did not have the statutory authority to order restitution to L&I for lost wages paid to Strong and Harris as a result of emotional distress caused by the crimes of intentional assault in the fourth degree and malicious and intentional felony harassment.

Interpretation of a statute is a question of law we review de novo. State v. Gonzalez, 168 Wn.2d 256, 263, 226 P.3d 131 (2010). The fundamental goal of

statutory interpretation is to ascertain and carry out the intent of the legislature. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). We begin with the plain language of the statute. Armendariz, 160 Wn.2d at 110. It is the duty of the court to construe statutes in a manner that best fulfills legislative intent. State ex. rel. Royal v. Bd. of Yakima County Comm'rs, 123 Wn.2d 451, 462, 869 P.2d 56 (1994). If the statute is unambiguous after a review of the plain meaning, our inquiry is at an end. Gonzalez, 168 Wn.2d at 263.

In determining the plain meaning of a statute, we look at the context of the statute, related provisions, and the statutory scheme as a whole. State v. Jacobs, 154 Wn.2d 596, 600, 115 P.3d 281 (2005). A statute must be interpreted and construed to give effect to the language used in the statute with no portion rendered meaningless or superfluous. State v. J.P., 149 Wn.2d 444, 450, 69 P.3d 318 (2003). If the language of the statute is unambiguous, we assume the legislature means exactly what it says and "give effect to that plain meaning as an expression of legislative intent." State v. Keller, 143 Wn.2d 267, 276, 19 P.3d 1030 (2001); Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002); see also Armendariz, 160 Wn.2d at 110; Jacobs, 154 Wn.2d at 600. When engaging in statutory interpretation, we avoid constructions that yield unlikely, absurd, or strained consequences. State v. Barbee, 187 Wn.2d 375, 389, 386 P.3d 729 (2017).

The authority to impose restitution is entirely statutory. State v. Deskins, 180 Wn.2d 68, 81, 322 P.3d 780 (2014); State v. Tobin, 161 Wn.2d 517, 523, 166 P.3d 1167 (2007). The Sentencing Reform Act of 1981, chapter 9.94A RCW, gives the court the

statutory authority to order restitution. RCW 9.94A.753(5) provides, in pertinent part:

> Restitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property . . . unless extraordinary circumstances exist which make restitution inappropriate in the court's judgment and the court sets forth such circumstances in the record.

Restitution is both punitive and compensatory. State v. Kinneman, 155 Wn.2d 272, 279-80, 119 P.3d 350 (2005). The restitution statute requires the defendant "to face the consequences of his or her criminal conduct." Tobin, 161 Wn.2d at 524. In State v. Davison, 116 Wn.2d 917, 920, 809 P.2d 1374 (1991), the Washington Supreme Court held the "language of the restitution statute[ ] indicates legislative intent to grant broad powers of restitution." In State v. Hiett, 154 Wn.2d 560, 564, 115 P.3d 274 (2005), the court held the legislature intended to make restitution widely available to the victims of crimes. Because the restitution statute is interpreted to carry out statutory intent, the court does "not engage in overly technical construction that would permit the defendant to escape from just punishment." Tobin, 161 Wn.2d at 524. The statute authorizes the court to order restitution up to "double the amount of the offender's gain or the victim's loss from the commission of the crime." RCW 9.94A.753(3).

Before ordering restitution, the court must find a causal connection between the defendant's crime and the injury. State v. Enstone, 137 Wn.2d 675, 682, 974 P.2d 828 (1999); Tobin, 161 Wn.2d at 524. A causal connection exists if but for the crime, the victim would not have incurred the loss. State v. Griffith, 164 Wn.2d 960, 966, 195 P.3d 506 (2008); Tobin, 161 Wn.2d at 524.

RCW 9.94A.753(3) states, in pertinent part:

> [R]estitution ordered by a court pursuant to a criminal conviction shall be based on easily ascertainable damages for injury to or loss of property,

actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury. Restitution shall not include reimbursement for damages for mental anguish, pain and suffering, or other intangible losses, but may include the costs of counseling reasonably related to the offense.

Gonce argues RCW 9.94A.753(3) authorizes the court to order restitution for lost wages resulting from only "physical" injury, not emotional distress. Gonce points to the distinction the legislature makes in the restitution statute between the language that allows lost wages resulting from injury and the language that does not allow damages for mental anguish and pain and suffering. Neither the plain language of the restitution statute nor legislative history supports his argument.

When originally enacted in 1981, the restitution statute limited restitution to "lost wages resulting from physical injury." Former RCW 9.94A.140(1) (LAWS OF 1981, ch. 137, § 14).[2] Former RCW 9.94A.140(1) (1981) states, in pertinent part:

Restitution ordered by a court pursuant to a criminal conviction shall be limited to easily ascertainable damages for injury to or loss of property, actual expenses incurred for medical treatment for physical injury to persons, and lost wages resulting from physical injury. Restitution shall not include reimbursement for damages for mental anguish, pain and suffering, or other intangible losses.[3]

The next year, the legislature amended the restitution statute to delete the word "physical." Former RCW 9.94A.140(1) (LAWS OF 1982, ch. 192, § 5). As amended in 1982, the statute does not limit lost wages resulting from injury to only physical injury. Former RCW 9.94A.140(1) (1982) states, in pertinent part:

Restitution ordered by a court pursuant to a criminal conviction shall be based on easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury. Restitution shall not include reimbursement

---

[2] Emphasis added.
[3] Emphasis added

for damages for mental anguish, pain and suffering, or other intangible losses.[4]

The plain and unambiguous language that authorizes the court to order restitution for reasonably ascertainable "lost wages resulting from injury" has not changed in 35 years. It is a well-recognized rule of statutory construction that " 'where a law is amended and a material change is made in the wording, it is presumed that the legislature intended a change in the law.' " Guillen v. Pierce County, 144 Wn.2d 696, 723, 31 P.3d 628 (2001) (quoting Home Indem. Co. v. McClellan Motors, Inc., 77 Wn.2d 1, 3, 459 P.2d 389 (1969)), rev'd on other grounds sub nom. Pierce County, Wash. v. Guillen, 537 U.S. 129, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003); see also Davis v. Dep't of Licensing, 137 Wn.2d 957, 967, 977 P.2d 554 (1999) (a change in legislative intent is presumed when a material change is made in a statute). The legislature is "deemed to intend a different meaning when it uses different terms." State v. Roggenkamp, 153 Wn.2d 614, 625, 106 P.3d 196 (2005).

By deleting "physical," the legislature uses only the broader term "injury." The legislature does not define "injury." When the legislature does not define a term, we give the term its ordinary meaning and may look to a dictionary. Gonzalez, 168 Wn.2d at 263. The dictionary defines "injury" as "an act that damages, harms, or hurts : an unjust or undeserved infliction of suffering or harm." WEBSTER'S THIRD NEW

---

4 (Emphasis added.) We note that in 1985, the legislature enacted RCW 9.94A.142 for offenses committed after July 1, 1985 with nearly identical statutory language. LAWS OF 1985, ch. 443, § 10. Former RCW 9.94A.140 applied to offenses committed on or before July 1, 1985. We also note that in 1987, the legislature amended the restitution statute to authorize the court to order restitution for counseling costs "reasonably related to the offense." Former RCW 9.94A.142(1) (LAWS OF 1987, ch. 281, § 4). Former RCW 9.94A.140(1) (1982) was also amended to include counseling costs. LAWS OF 1987, ch. 281, § 3. In 2001, former RCW 9.94A.142 was recodified as RCW 9.94A.753. LAWS OF 2001, ch. 10, § 6. Former RCW 9.94A.140 was recodified as RCW 9.94A.750. LAWS OF 2001, ch. 10, § 6.

INTERNATIONAL DICTIONARY 1164 (2002). We conclude the restitution statute RCW 9.94A.753(3) authorizes the court to order restitution for reasonably ascertainable lost wages resulting from emotional distress injury caused by the crime.

Gonce argues that allowing restitution for lost wages resulting from emotional distress renders the exception for intangible losses for damages from mental anguish and pain and suffering meaningless.[5] We disagree. The plain and unambiguous language of RCW 9.94A.753(3) states restitution must be "based on easily ascertainable . . . lost wages resulting from injury." By contrast, the legislature states restitution shall not include "reimbursement for damages for mental anguish, pain and suffering, or other intangible losses." RCW 9.94A.753(3).

Intangible damages for mental anguish and pain and suffering are not capable of being quantified with exactness. State v. Landrum, 66 Wn. App. 791, 798, 832 P.2d 1359 (1992). But unlike intangible losses for damages from mental anguish and pain and suffering, lost wages incurred as a result of emotional distress are objective and easily ascertainable. Here, the record establishes lost wages L&I paid to Harris and Strong for time off from work as a result of emotional distress caused by the charged crimes are documented and easily quantifiable. We also note that in order to receive compensation for medical treatment, counseling, and wage loss, the employee must submit supporting documentation to L&I and comply with rules promulgated by L&I. See RCW 51.32.060, .090; see also WAC 296-20-025.

---

[5] We interpret statutes to give effect to the language used with no portion rendered meaningless or superfluous. J.P., 149 Wn.2d at 450.

13

We affirm the order of restitution.[6]

WE CONCUR:

_____

_____

_____

_____

---

[6] The State requests an award of costs on appeal. Appellate costs are generally awarded to the substantially prevailing party. RAP 14.2. However, where a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Under RAP 14.2, the State may file a motion for costs with the commissioner if financial circumstances have significantly improved since the finding of indigency. State v. St. Clare, 198 Wn. App. 371, 382, 393 P.3d 836 (2017).