IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

              Respondent,

        v.

JAMES DEAN SCHULTZ,

              Appellant.

No. 84570-5-I
(consolidated with
No. 84972-7-I)

DIVISION ONE

PUBLISHED OPINION

HAZELRIGG, A.C.J. — James Schultz was convicted of murder in the second degree and the trial court imposed a standard range sentence of 220 months and ordered him to pay restitution. On appeal, he argues the judge did not meaningfully consider his intellectual disability as a mitigating factor for an exceptional sentence below his standard range, presents a number of challenges to the award of restitution, and assigns error to the imposition of certain legal financial obligations (LFOs) based on his indigency. We affirm the sentence and matters relating to restitution, but remand for the trial court to strike the LFOs and consider the statutory factors regarding imposition of interest on the award of restitution.

FACTS

On June 18, 2020, Schultz and a group of other people, including Nicholas Germer, gathered at a bonfire near the Cedar River in unincorporated King County. Schultz and Germer did not know each other. Germer and another individual got into an argument about current events. A tattooed man in a white T-shirt, red hat,

and light-colored pants with paint on them, later identified as Schultz, approached the discussion and punched Germer in the face. Germer then hit Schultz in the head with a vodka bottle, causing him to fall over an embankment. Schultz went to his truck in the parking area while two other individuals attempted to calm Germer down. Schultz's companion who had arrived at the bonfire with him saw blood on Schultz's head and attempted to get Schultz into the truck, but Schultz said he was going to "get that guy." His companion urged him "not to go back there" but Schultz pushed him into the bushes and returned to the bonfire, concealing a handgun behind his back. When he reached Germer, Schultz pulled the gun from behind his back and shot Germer at least three times in the chest, abdomen, and leg. At approximately 11:39 p.m., one of the individuals who had been at the bonfire called 911 and reported that someone had been shot.

Four deputies from the King County Sheriff's Office (KCSO) responded to the scene. They discovered Germer below the firepit and partially in the river. One deputy pulled Germer out of the water, observed a gunshot wound to the chest, and began performing CPR[1] while waiting for emergency medical aid to arrive. The deputies were able to identify Germer using a fingerprint scanner. Germer was transported by ambulance to the hospital where he later died during surgery as a result of his injuries.

Deputies surveyed the scene by the river and located four shell casings on the trail by the firepit, a hat at the bottom of the embankment, and broken branches and shrubbery in the area. They also discovered alcohol bottles, including a

---

[1] Cardiopulmonary resuscitation.

broken vodka bottle. Two detectives from the KCSO major crimes unit arrived on scene and collected additional evidence, including blood drops, saliva, footprints, bottles, cigarette butts, and the victim's cell phone and clothing. Through a discussion with Germer's friend, the detectives were able to locate and speak with several individuals who had observed the incident. Several of these witnesses identified Schultz with varying degrees of certainty through photo montages. Schultz turned himself in to the precinct, where he was advised of his *Miranda*[2] rights before participating in a recorded interview with police that lasted over four hours. In the statement Schultz provided to police, he denied that he had been hit with a bottle, possessed a gun, or shot anyone. Schultz claimed that he had been drinking and fell down the embankment. On June 29, 2020, Schultz was charged with murder in the first degree with a firearm enhancement.

The parties reached a plea agreement on April 26, 2022, wherein Schultz would plead guilty to a reduced charge of murder in the second degree, a class A felony, with the firearm enhancement and the State would recommend a sentence of 280 months in prison, including a mandatory consecutive term of 60 months for the firearm enhancement pursuant to RCW 9.94A.533. However, the plea agreement expressly noted that there was no agreement as to the length of incarceration; the State sought a high-end sentence and the defense requested an exceptional sentence below Schultz's standard sentencing range. The terms of the plea negotiations also included an agreement to a no contact order with Germer's family and other individuals, community custody, and restitution, and

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

stipulated to the facts set out in the probable cause affidavit for purposes of the plea and sentencing. Schultz entered his guilty plea on May 5 and, in his statement of defendant on plea of guilty, recanted his earlier statements to police disclaiming involvement in any shooting and declared that he "intentionally, and without premeditation, caused the death of Nicholas Germer, a human being, by shooting him with a firearm."

Schultz filed a sentencing memorandum that requested an exceptional mitigated sentence of 78 months, below his standard range of 123-220 months, based on his offender score of zero. He argued that the court should consider that he has permanent brain damage as a result of a neurodevelopmental disorder associated with prenatal alcohol exposure (ND-PAE), a type of fetal alcohol spectrum disorder, that Germer was the initial aggressor of the incident by striking him with a bottle, and that he has no history of felony convictions or violence. To support the first factor, he presented expert testimony by Dr. Megan Carter, a forensic psychologist, and a report by Dr. Natalie Novick Brown, a clinical psychologist. Novick Brown conducted interviews with Schultz and his family, gathered a chronology of Schultz's academic, medical, and criminal history, and executed several standardized psychological tests. Although the testing demonstrated that Schultz's IQ[3] "ruled out" an intellectual disability, his scores were low in other areas that were also evaluated. Novick Brown's report stated that Schultz "functions within the intellectually disabled range in unstructured environments where he must think independently in order to problem solve—a

---

[3] Intelligence quotient.

finding that has direct implications for his alleged conduct in the instant offense." She diagnosed Schultz with ND-PAE and opined that the condition "directly influenced his alleged offense conduct."

At the sentencing hearing on September 16, 2022, Carter concurred with Novick Brown's diagnosis and testified that the ND-PAE would have impacted Schultz's behavior regardless of his alcohol consumption, but agreed that alcohol may have contributed to the actions as well. Carter stated that Schultz's diagnosis could impact memory, an inability to understand the future impacts of statements made to the police, and the display of emotionally inappropriate behavior. The State countered this evidence with testimony from KCSO Sergeant James Belford, the lead detective on the case. Belford stated that, based on his training and experience, Schultz had exhibited behavior designed to evade responsibility for his conduct. Belford also said that, during the four-hour recorded interview, he did not have any difficulty communicating with Schultz and that he was not concerned that Schultz had any difficulty tracking the information they were discussing.

After expressly considering the purpose of the Sentencing Reform Act of 1981 (SRA),[4] the testimony presented, the written materials of the parties, including the expert reports, and oral argument, the trial court imposed a high-end sentence of 280 months. In setting out the reasoning for the sentence, the judge noted that Schultz had left the scene of the initial altercation with Germer to retrieve the gun from his truck and that he disregarded his companion's attempts to stop him. Although the judgment and sentence (J&S) indicated that restitution would

---

[4] Ch. 9.94A RCW.

be determined at a future hearing, the judge ordered Schultz to pay the $100 DNA[5] collection fee and $500 victim penalty assessment (VPA) as was required by statute at the time.[6]

On November 2, 2022, the State submitted documentation in support of its request for restitution. The evidence included documentation of the bereavement leave and paid time off (PTO) that each of Germer's parents used following their son's death; 10 days of missed work for Germer's mother between June 19 and July 2, 2020, and 9 days of missed work for his father between June 22 and July 6, 2020. The State sought an award of restitution in the amount of $1,784.72 to Germer's mother and $2,334.08 to his father based on the reported loss. It also sought $45.00 to reimburse Germer's sister for counseling and $6,375.87 for repayment to the crime victims' compensation fund for Germer's funeral expenses. The total amount of restitution requested by the State was $10,539.67. On December 19, 2022, Schultz filed a response and argued that he was entitled to a jury trial to determine the amount of restitution under the Sixth Amendment to the United States Constitution and that the portion of the award that the State was requesting for Germer's parent's PTO constituted an excessive fine in violation of the Eighth Amendment to the United States Constitution and article I, § 14 of the Washington Constitution.

A restitution hearing was held on January 31, 2023. After considering oral argument from both parties, the trial court awarded the full amount of restitution sought by the State. It concluded that case law did not provide the right to a jury

---

[5] Deoxyribonucleic acid.
[6] Former RCW 43.43.7541 (2018); former RCW 7.68.035 (2018).

trial for a determination of restitution and that the amount of the award did not constitute an excessive fine. The court also expressly stated that it had "considered the factors that the *Ramos*[7] case . . . directs [it] to consider, including the nature and extent of the crime, the violation itself, the extent of the harm caused, other penalties that may be imposed for this crime, and [] Schultz's ability to pay or inability to pay" and that the restitution request was reasonable in light of those factors.

Schultz timely appealed.

ANALYSIS

Schultz raises multiple challenges relating to his J&S. As a threshold matter, the SRA states that "a sentence within the standard sentence range . . . for an offense shall not be appealed." RCW 9.94A.585(1). When the trial court imposes a standard range sentence over a party's request for an exceptional sentence, review is only permissible in "'circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range.'" *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (internal quotation marks omitted) (quoting *State v. McGill*, 112 Wn. App. 95, 100, 47 P.3d 173 (2002). If reviewable, this court will only find that the trial court erred if it "'refuses categorically to impose an exceptional sentence below the standard range under any circumstances' or when it operates under the 'mistaken belief that it did not

---

[7] *State v. Ramos*, 24 Wn. App. 2d 204, 520 P.3d 65 (2022), *review denied*, 200 Wn.2d 1033 (2023).

have the discretion to impose a mitigated exceptional sentence for which a defendant may have been eligible.'" *Id*. (quoting *State v. Garcia-Martinez,* 88 Wn. App. 322, 330, 944 P.2d 1104 (1997); *In re Pers. Restraint of Mulholland*, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

We conduct our review under the exceptions to the SRA's general prohibition on appeals of the imposition of a standard range sentence.

## I.     Consideration of Mitigation Information at Sentencing

Schultz first challenges his standard range sentence and argues that the trial court erred when it failed to meaningfully consider how his intellectual disability reduced his capacity to conform his conduct to the law under RCW 9.94A.535(1)(e).  RCW 9.94A.535 permits a court to "impose a sentence outside the standard sentence range for an offense if it finds . . . that there are substantial and compelling reasons justifying an exceptional sentence."  The statute provides several illustrative examples of mitigating factors, including that the "defendant's capacity to appreciate the wrongfulness of [their] conduct, or to conform [their] conduct to the requirements of the law was significantly impaired."  RCW 9.94A.535(1)(e).  Again, because the trial court entered a sentence within the standard range, this court's review of the sentencing decision is limited to circumstances where the trial court has refused to exercise discretion *at all* or used an impermissible basis for refusing to impose an exceptional sentence.  *Garcia-Martinez*, 88 Wn. App. at 330 (emphasis added).

As a preliminary matter, the record establishes that the trial court may have reasonably found that Schultz does not actually have an intellectual disability.  His

mitigation expert, Novick Brown, explicitly acknowledged in her report that, because Schultz's IQ was 80, "intellectual disability is [] ruled out." Carter likewise testified that although Schultz's IQ "is a little bit below average, it's not considered intellectually disabled." Although Novick Brown also explained that Schultz behaved "within the intellectually disabled range" in certain situations, the court may not have been convinced that her assessment and diagnoses presented a condition that would be considered an intellectual disability to the extent that the request for an exceptional downward departure on that basis was sufficiently supported. Schultz does not present any evidence that ND-PAE, particularly when paired with an IQ score above the standard indicative of intellectual disability, is widely accepted by the medical or psychiatric community as an intellectual disability.

More critically, even accepting Novick Brown's diagnosis of ND-PAE and assuming the condition to be an intellectual disability, there is no legal precedent requiring the trial court to deviate from the standard sentencing range on that basis. Both our federal and state constitutions forbid the imposition of cruel and unusual punishment. U.S. CONST. amend. VIII; WASH. CONST. art. 1 § 14. These provisions stem from the premise that punishment for a crime should be proportionate to both the offender and the offense. *Miller v. Alabama,* 567 U.S. 460, 469, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The concept of proportionality is viewed according to "'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* 469-70 (internal quotation marks omitted) (quoting *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)). Courts have used these

principles to place limitations on sentencing in criminal cases. *See id*. at 465 (courts may not impose mandatory life imprisonment without parole on juvenile defendants); *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (courts may not levy capital punishment on offenders under 18 at time of crime); *Kennedy v. Louisiana*, 554 U.S. 407, 413, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) (death penalty may not be ordered for nonhomicide crimes); *Graham v. Florida*, 560 U.S. 48, 62, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (courts may not give life sentence without possibility of parole for juveniles convicted of nonhomicide offenses). Particularly relevant to this appeal, *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) prohibited capital punishment for defendants with intellectual disabilities. However, to date, there is no federal or Washington authority that prohibits courts from imposing *standard range sentences* where intellectual disability has been presented as a mitigating factor.

Even so, there is evidence in the record that the trial court here *did* consider Schultz's diagnosis of ND-PAE. Unlike the heightened requirements for the consideration of mitigating factors of youth, the trial court here was not required to follow a particular metric of "meaningful" consideration or provide a precise evaluation of each factor on the record. As the trial court imposed a standard range sentence, there need only be evidence in the record establishing that it exercised any amount of discretion at all. *Garcia-Martinez*, 88 Wn. App. at 330. After hearing the testimony of Schultz's expert witness and reading the reports that were provided, the trial court judge stated:

> I spent time this week preparing for the sentencing today, including considering the written materials that were provided to me. Without limitation, those include the expert opinions that were provided, letters from family members, a letter from the defendant himself. I've also considered and have been taking notes in regard to the testimony given today and the arguments and statements made today. I've also considered the purposes and rationale of the [SRA].

Looking at the record as a whole, particularly these statements, the trial court clearly considered the mitigating evidence that Schultz provided. He does not offer authority that requires a sentencing court to do anything more. Accordingly, Schultz's argument on this issue fails.

## II.  Challenges To Restitution

An award of restitution in a criminal case is authorized by the SRA. RCW 9.94A.750, .753. Schultz assigns error to both the ultimate determination on restitution and the process by which it was reached. He asserts the trial court violated his constitutional right to have a jury determine restitution, that there was not a sufficient causal connection between his criminal conduct and the amount awarded, and that the award of restitution was unconstitutionally excessive. Each of Schultz's arguments on restitution fail.

### A.  No Constitutional Right to Jury Trial on Restitution

Schultz next asserts that the trial court erred when it denied his motion for a jury determination of restitution under both the federal and state constitutions. A party arguing that a provision of the state constitution offers greater protection than a similar provision in the federal constitution must first provide an analysis under

*State v. Gunwall*[8] or we only review the federal provision. *See State v. Ladson*, 138 Wn.2d 343, 347-48, 979 P.2d 833 (1999). Because Schultz does not appear to argue greater protection under our state constitution or engage in a *Gunwall* analysis to demonstrate how it might provide greater protection than the Sixth Amendment, our evaluation of his challenge is constrained to the federal constitution. The Sixth Amendment guarantees the accused the right to a jury trial. U.S. CONST. amend. VI. The role of the jury "is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Although current case law necessitates a jury determination for increases in prison sentences beyond the statutory maximum, *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 425 (2000), and certain criminal fines, *Southern Union Co. v. United States,* 567 U.S. 343, 360, 132 S. Ct. 2344, 183 L. Ed. 2d 318 (2012), there is no existing right to, or precedent supporting a jury determination on restitution.

Schultz primarily relies on *Apprendi* and *Southern Union* to support his argument that this court should expand the protections of the Sixth Amendment to include a requirement for a jury determination of restitution. *Apprendi* held that any fact that increases imprisonment "for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Twelve years later, *Southern Union* applied the principles of *Apprendi* to the imposition of certain criminal penalties and ruled that there is no

---

[8] 106 Wn.2d 54, 720 P.2d 808 (1986).

basis for treating criminal fines differently than imprisonment so long as the fine is substantial enough to trigger the right to a jury trial. *Id.* at 349-50, 352.

Schultz argues that the reasoning from *Apprendi* and *Southern Union* extends to restitution which, like imprisonment or criminal fines, is an aspect of punishment imposed upon conviction. However, our state Supreme Court expressly ruled in *State v. Kinneman* that, under United States Supreme Court precedent, there is no federal constitutional right to a jury determination of restitution. 155 Wn.2d 272, 281-82, 119 P.3d 350 (2005). In *Kinneman*, our Supreme Court explained:

> [W]hile restitution is punishment, it does not require jury fact-finding under the post-*Blakely*[9] decision in *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). In *Booker*, the Court held that provisions making the Federal Sentencing Guidelines mandatory and setting forth the standard of review on appeal were unconstitutional because they violated the Sixth Amendment right to a jury trial. The Court severed these provisions, leaving the Guidelines as effectively advisory. The Sixth Amendment was then not implicated because statutes that do not impose mandatory, binding requirements on sentencing judges do not implicate the right to a jury trial. *Booker*, 543 U.S. at 233 (Stevens, J.) ("when a trial judge exercises [their] discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant."); *id*. at 257 (Breyer, J.).
> Washington's restitution statutes are more like the advisory Federal Sentencing Guidelines after *Booker* than the mandatory sentencing guidelines found to violate the Sixth Amendment in *Blakely*. RCW 9.94A.753(5) provides that "restitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person or damage to or loss of property . . . unless extraordinary circumstances exist which make restitution inappropriate in the court's judgment." . . .
> While the restitution statute directs that restitution "shall" be ordered, it does not say that the restitution ordered must be equivalent to the injury, damage or loss, either as a minimum or a maximum, nor does it contain a set maximum that applies to restitution. Instead, RCW 9.94A.753 allows the judge considerable

---

[9] *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004).

discretion in determining restitution, which ranges from none (in some extraordinary circumstances) up to double the offender's gain or the victim's loss. . . .

Given the broad discretion accorded the trial judge by the statute, the lack of any set maximum, and the deferential abuse of discretion review standard, the restitution statute provides a scheme that is more like indeterminate sentencing not subject to Sixth Amendment jury determinations than the SRA's determinate sentencing scheme at issue in *Blakely*. . . .

*There is no right to a jury trial to determine facts on which restitution is based under RCW 9.94A.753.*

*Id.* (emphasis added) (third alteration in original).

*Southern Union* did not overrule or otherwise abrogate *Booker* or our state precedent in *Kinneman*, and there is no other case law binding this court to Schultz's requested interpretation that *Apprendi* applies to restitution. Recent unpublished opinions of this court have plainly and consistently followed *Kinneman* and denied the exact challenge Schultz now presents.[10] *See, e.g., State v. Youngkeun Lee,* No. 72828-8-I, slip op. at 7 (Wash. Ct. App. Jan. 19, 2016) (unpublished) ("Although Lee rejects the *Kinneman* court's reasoning, *Kinneman* is still good law in Washington."), https://www.courts.wa.gov/opinions/pdf/728288.pdf; *State v. Carde,* No. 73324-9-I, slip op. at 15 (Wash. Ct. App. Jan. 30, 2017) (unpublished) (explaining Washington Supreme Court held there is no right to jury trial to determine facts on restitution), https://www.courts.wa.gov/opinions/pdf/733249.pdf; *State v. Beasley*, No. 75002-0-I, slip op. at 10 (Wash. Ct. App. Aug. 7, 2017) (unpublished) ("We adhere to the Washington Supreme Court decision in *Kinneman* and hold there is no right to a jury trial to determine the facts establishing

---

[10] Pursuant to GR 14.1(c), we may cite to unpublished opinions as "necessary for a reasoned decision." We provide them here only to demonstrate the scope of the judicial recognition of *Kinneman* as controlling authority.

- 14 -

the amount of restitution."), https://www.courts.wa.gov/opinions/pdf/750020.pdf; *State v. Kao Cho Saephanh*, No. 75844-6-I, slip op. at 9 (Wash. Ct. App. Jan. 22, 2018) (unpublished) (holding *Southern Union* does not implicate restitution and *Kinneman* is binding), https://www.courts.wa.gov/opinions/pdf/758446.pdf. Nearly two decades ago, our state's highest court thoughtfully and explicitly considered the precise challenge presented here, analyzing it within the framework of federal case law, and rejected it. As an intermediate appellate court bound to follow the controlling precedent of the Washington State Supreme Court, we decline Schultz's invitation to expand the holdings in *Apprendi* and *Southern Union*.

### B. Causal Connection and Award of Restitution

Schultz next contends that the trial court erred in awarding restitution to Germer's parents because the State did not demonstrate that the use of their PTO was connected to an injury as required by law.[11] Restitution is governed by statute. *State v. Tobin,* 161 Wn.2d 517, 524, 166 P.3d 1167 (2007). Absent a finding of extraordinary circumstances, the SRA anticipates an order of restitution when a defendant "is convicted of an offense which results in injury to any person or damage to or loss of property." RCW 9.94A.753(5). Restitution includes "easily ascertainable damages for injury to or loss of property, actual expenses incurred for treatment for injury to persons, and lost wages resulting from injury." RCW 9.94A.753(3)(a). It does not include "reimbursement for damages for mental

---

[11] Schultz also avers, as a threshold matter, that PTO is not the equivalent of lost wages because Germer's parents were paid by their employers for their time off of work. We reject this initial argument as this court has already determined that PTO constitutes property under the restitution statute. *State v. Long*, 21 Wn. App. 2d 238, 243, 505 P.3d 550, *review denied,* 200 Wn.2d 1004 (2022).

- 15 -

anguish, pain and suffering, and other intangible losses." *Id.* Restitution is only permitted for losses that are "causally connected" to the crime, which is established if the loss would not have occurred but for the criminal act. *Tobin*, 161 Wn.2d at 524 (quoting *Kinneman*, 155 Wn.2d at 286).

If a defendant disputes the amount of restitution requested by the State, the court must hold a hearing to determine the amount to be awarded. RCW 9.94A.753(1). The State must prove the amount requested by a preponderance of the evidence. *State v. Griffith*, 164 Wn.2d 960, 965, 195 P.3d 506 (2008). As the legislature intended restitution to be a financial consequence of the defendant's criminal conduct, the trial court is granted broad powers to determine the award. *Tobin*, 161 Wn.2d at 524. "So long as the court [] imposed a type of restitution authorized by statute, we will reverse its award only if it abused its discretion." *State v. Thomas*, 138 Wn. App. 78, 81, 155 P.3d 998 (2007). While acknowledging our courts have recognized that emotional distress may result in the tangible lost wages restitution is designed to reimburse, Schultz asserts that the State did not demonstrate the required causal connection between the emotional distress experienced by Germer's parents and their use of PTO. However, he waived this assignment of error as he expressly conceded a causal connection in both his briefing and argument to the trial court. At the restitution hearing, Schultz admitted that "there is certainly a nexus between, you know, their loss and grief and inability to work."

Even if Schultz had not so conceded, all the trial court was required to find in order to award the amount of restitution requested by the State was that the

expenses for which reimbursement was sought were causally connected to the crime. *Tobin*, 161 Wn.2d at 524. Germer's parents testified to the emotional distress they experienced as a result of their son's murder and presented accompanying documentation of their resulting use of PTO. Schultz's challenge on this issue fails.

### C.    Purely Compensatory Restitution

Schultz argues that the Eighth Amendment and art. I, § 14 prohibit the trial court from awarding the full $10,539.67 in restitution without consideration of his inability to pay. In the trial court, he only raised this challenge as to the portion of restitution ordered payable to Germer's parents. As Schultz does not allege that a manifest constitutional error occurred regarding restitution for the crime victims' compensation fund or Germer's sister's counseling, we evaluate this challenge exclusively in the context of the restitution he was ordered to pay for Germer's parent's use of PTO.

The provisions of both our federal and state constitutions prohibit the imposition of "excessive fines." U.S. CONST. amend. VIII; WASH. CONST. art. I, § 14. The United States Supreme Court has held that excessive fines should be viewed under a standard of proportionality and that a punitive fine violates the Eighth Amendment if it is "grossly disproportional to the gravity of the offense." *United States v. Bajakajian*, 524 U.S. 321, 324, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998). Generally, "we view article I, section 14 and the Eighth Amendment as coextensive for the purposes of excessive fines." *City of Seattle v. Long*, 198 Wn.2d 136, 159, 493 P.3d 94 (2021).

To determine whether the amount of restitution is excessive in violation of the Eighth Amendment, the reviewing court must first ascertain whether the financial assessment constitutes "punishment." *State v. Ramos*, 24 Wn. App. 2d 204, 215, 520 P.3d 65 (2022), *review denied,* 200 Wn.2d 1033 (2023). For example, in *Ramos,* the court concluded that the penalty was partially punitive based on the particular facts of that restitution award. *Id.* at 226. If a financial penalty is found to be punitive, and therefore a "fine," "[t]he second question is whether the sanction is grossly disproportional to the offense." *Id.* at 215. Separately, Washington law provides that trial courts may consider a defendant's ability to pay when determining the minimum monthly payment ordered in an award of restitution, but expressly "*may not* reduce the total amount of restitution ordered because the offender may lack the ability to pay the total amount." RCW 9.94A.753(1), (4) (emphasis added).

The restitution that Schultz was ordered to pay to Germer's parents directly compensated them for their use of PTO following the death of their son due to Schultz's conduct. Again, Schultz conceded the causal connection between Germer's murder and his parents' use of bereavement leave. Germer's parents provided documentation of those losses and restitution was awarded in that exact amount. This portion of the restitution award was therefore compensatory, not a fine subject to an excessive fines analysis, and we need not reach the second step of the *Ramos* inquiry.

III.    Legal Financial Obligations

Finally, Schultz asserts that, because he is indigent, recent legislative changes require this court to strike the LFOs, specifically the $500 VPA and the $100 DNA fee.  He further asks that the trial court be directed to consider striking the interest on the restitution award.  The trial court found that Schultz was indigent and the RAPs presume continued indigency throughout appellate review.  *State v. Sinclair*, 192 Wn. App. 380, 393, 367 P.3d 612 (2016), RAP 15.2(f) ("The appellate court will give a party the benefits of an order of indigency throughout the review unless the trial court finds the party's financial condition has improved.").

A.    VPA and DNA Collection Fee

The Washington Legislature eliminated the DNA collection fee for defendants who have been found indigent as of July 1, 2023, after Schultz was sentenced.  RCW 43.43.7541(2).  On that same date, another legislative amendment became effective that prohibited the imposition of the VPA if the defendant is indigent.  RCW 7.68.035(5).

Although the revisions occurred after Schultz was sentenced, our state Supreme Court held in *State v. Ramirez* that amendments of this kind apply prospectively to cases pending direct review.  191 Wn.2d 732, 747, 426 P.3d 714 (2018).  The court considered the applicability of other legislative revisions concerning the court's ability to impose costs on a criminal defendant who is indigent at the time of sentencing and concluded that, because the defendant's case was on appeal as a matter of right, the case was not final pursuant to RAP 12.7 and he was entitled to the benefit of the changes.  *Id.* at 749.  The statutory

changes in this case, RCW 43.43.7541(2) and RCW 7.68.035(5), also pertain to the imposition of costs on a criminal defendant found indigent at the time of sentencing and, by the reasoning in *Ramirez*, Schultz is entitled to the benefit of the amendments as his case is pending appeal.

The State does not agree that these LFOs are costs under RCW 10.01.160(3) and, on that basis, argues that *Ramirez* does not control. However, this court has consistently held that the VPA and DNA fees are captured within these statutory amendments and indigent defendants are entitled to relief if their appeal is pending. *See, e.g., State v. Phillips,* 6 Wn. App. 2d 651, 677, 431 P.3d 1056 (2018); *State v. Wemhoff*, 24 Wn. App. 2d 198, 201, 519 P.3d 297 (2022); *Ellis*, 27 Wn. App. 2d at 16. We see no reason to deviate from this court's consistent practice of remand for the trial court to amend the J&S to comply with the statutory amendments.

B.     Interest on Restitution

In a related assignment of error, Schultz seeks relief from the court's imposition of interest on the award of restitution. Effective January 1, 2023, after Schultz's sentencing hearing, RCW 10.82.090 was revised to include the following language:

> The court may elect not to impose interest on any restitution the court orders. Before determining not to impose interest on restitution, the court shall inquire into and consider the following factors: (a) Whether the offender is indigent as defined in RCW 10.01.160(3) or general rule 34; (b) the offender's available funds, as defined in RCW 10.101.010(2), and other liabilities including child support and other legal financial obligations; (c) whether the offender is homeless; and (d) whether the offender is mentally ill, as defined in RCW 71.24.025. The court shall also

consider the victim's input, if any, as it relates to any financial hardship caused to the victim if interest is not imposed. The court may also consider any other information that the court believes, in the interest of justice, relates to not imposing interest on restitution. After consideration of these factors, the court may waive the imposition of restitution interest.

RCW 10.82.090(2).

Schultz argues that because his case is still pending appeal he is entitled to benefit from changes in the law. This court agreed with Schultz's position in *State v. Reed* and held "restitution interest is analogous to costs for purposes of applying the rule that new statutory mandates apply in cases, like this one, that are on direct appeal." 28 Wn. App. 2d 779, 782, 538 P.3d 946 (2023). As Schultz's case is on direct appeal, he is entitled to remand for the trial court to consider whether to impose interest on restitution in light of the statutory factors and its prior finding of indigency.

Affirmed in part, reversed in part, and remanded.

WE CONCUR:

- 21 -