IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent,<br><br>        v.<br><br>LEON CARIL, II,<br><br>        Appellant. | No. 85252-3-I<br><br>DIVISION ONE<br><br>ORDER GRANTING MOTION FOR RECONSIDERATION IN PART AND DENYING IN PART AND WITHDRAWING AND SUBSTITUTING OPINION |

Appellant filed a motion for reconsideration on October 14, 2023.  After review of the motion, a panel of this court has determined that the motion for reconsideration should be granted only as to the legal financial obligations and application of the statutory factors regarding interest, and should be denied as to the remaining issues presented.  The court has further determined that the opinion filed September 23, 2024 should be withdrawn and a substitute opinion filed.

Now, therefore, it is hereby

ORDERED that the motion for reconsideration is granted in part and denied in part; and it is further

ORDERED that the opinion filed September 23, 2024 shall be withdrawn and a substitute opinion filed.

_____
Hazelrigg, A.C.J.

_____
Díaz, J.

_____
Mann, J.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| STATE OF WASHINGTON, | |
|---|---|
| Respondent, | No. 85252-3-I |
| v. | DIVISION ONE |
| LEON CARIL, II, | UNPUBLISHED OPINION |
| Appellant. | |

HAZELRIGG, A.C.J. — Leon Caril appeals from his resentencing after remand from this court. He asserts that his remote appearance at the hearing violated due process and specifically that he was denied the right to be present and to confidentially confer with counsel. He further challenges the factual basis for the calculation of his offender score and the court's imposition of the victim penalty assessment (VPA) and interest on restitution in light of the court's finding of indigency. With the exception of the legal financial obligations, Caril fails to demonstrate error. We affirm the sentence, but remand for the trial court to strike the VPA and apply the statutory factors regarding the imposition of interest on restitution.

FACTS

The State charged Caril with murder in the second degree—intentional murder—with an allegation that he committed the crime with a deadly weapon based on the stabbing death of Andrew Pimenthal in June 2017. The State filed an amended information roughly a year and a half later that added a separate charge of murder in

the first degree—premeditation—also with a deadly weapon enhancement (Count 1) and changed the murder in the second degree charge from intentional to felony murder, maintaining the deadly weapon enhancement (Count 2).[1]  Caril has a history of mental illness and was diagnosed with paranoid schizophrenia in 2010, 2011, 2012, 2015, and 2016.  During the pretrial phase of the case, the superior court found Caril was not competent to stand trial and committed him to Western State Hospital for a 90-day restoration period.   After restoration, the superior court deemed Caril competent to proceed to trial and a jury eventually convicted him of the lesser included crime of murder in the second degree—intentional murder on Count 1 and as charged on Count 2 of murder in the second degree—felony murder.  The jury also found by special verdicts that both crimes were committed with a deadly weapon for purposes of sentencing enhancement.  The trial court vacated count 2 on double jeopardy grounds at sentencing.  Based on his criminal history, which included prior convictions for most serious or "strike" offenses, the court found that Caril was a persistent offender and sentenced him to a mandatory term of life in prison without the possibility of parole.  Caril timely appealed and this court affirmed his conviction, but remanded for a de novo resentencing due to changes in the law.

On March 20, 2023, in preparation for resentencing, Caril's trial counsel informed the court and prosecutor via e-mail that Caril wished to participate in the hearing through Zoom.[2]  Later in that same e-mail thread, Caril's counsel and the court bailiff discussed the necessary accommodations for a remote appearance,

---

[1] Additional facts are set out in the opinion from Caril's first direct appeal, *State v. Caril*, 23 Wn. App. 2d 416, 515 P.3d 1036 (2022), *review denied*, 200 Wn.2d 1025, *cert. denied sub nom. Caril v. Washington,* 144 S. Ct. 125 (2023).

[2] Zoom is an internet-based videoconferencing platform.

including fingerprinting procedures for the judgment and sentence (J&S).[3]  The next day, Caril's counsel also contacted the Department of Corrections (DOC) and submitted a request for a virtual hearing.

During this time, from March 17 to April 5, Caril sent seven letters to the trial court and prosecutor.  In these letters, Caril expressed dissatisfaction with his counsel, stating his attorney was not negotiating sentencing strategies with him or complying with amendments to applicable law.  While Caril's letters presented a number of his beliefs about the status of his conviction and incarceration, he never expressed a wish to appear in person at his resentencing hearing or made any statements in these letters that contradicted his attorney's assertion to the court and prosecutor about his request to appear remotely at the hearing.  When Caril appeared via Zoom for resentencing, the judge did not advise him of any procedures for privately conferring with counsel during the hearing, but did invite Caril to address the court.  While the camera angle in the courtroom initially prevented Caril from seeing the prosecutor during her opening statement, when the judge noticed this on the screen, the camera was adjusted; this temporary minor technical issue did not impact Caril's ability to participate at his resentencing hearing.  He did not ask for the opportunity to speak privately with his counsel or express any concerns about his ability to do so.  Instead, he spoke at length about issues that, while very important to him, were ultimately unrelated to the resentencing.  The court explicitly corrected Caril's mistaken belief that his juvenile convictions were included in his offender score.

---

[3] The prosecutor was also included in the entirety of this e-mail communication, but did not participate in the discussion about the logistics of Caril's remote appearance.

The State recommended a sentence at the high end of Caril's sentencing range. Caril's attorney sought an exceptional sentence below the standard range based both on his contention that Caril's mental health crisis at the time of murder affected his conduct and having presented a failed mental health defense at trial. Defense counsel further argued that the court should impose a low end sentence if it rejected his request for an exceptional downward departure. The trial court rejected both defense requests and sentenced Caril to a total term of 384 months in prison; a standard range sentence of 360 months for count 1 followed by a consecutive term of 24 months for the deadly weapon enhancement and 36 months of community custody supervision upon release from prison. The court found Caril was indigent, but nonetheless imposed the $500 VPA and ordered him to pay interest on the restitution award.

Caril was given another opportunity to address the trial court after the sentence was pronounced and did so, but again did not request an opportunity to confer with counsel and only spoke about juvenile convictions that were not part of his offender score calculation.

Caril timely appealed.

ANALYSIS

Caril presents a number of challenges to his resentencing, asserting violations of his constitutional rights, that the trial court failed to hold the State to its burden to prove his criminal history for purposes of calculating his offender score, and the improper imposition of certain legal financial obligations despite the court's finding of

indigency. Caril also thrice submitted a pro se statement of additional grounds for review, presenting a wide variety of issues for our consideration.

I.      Challenges To Remote Appearance at Resentencing Hearing

Caril raises several constitutional challenges to the manner by which the trial court conducted his resentencing hearing and seeks remand for yet another resentencing. However, he fails to demonstrate reversible error.

A.      Right to Be Present

As a starting point, the record before us clearly establishes that Caril's trial counsel explicitly advised the court of his client's request to appear remotely at the resentencing and coordinated with the court to make the necessary arrangements. Further, Caril did not object during the resentencing hearing to his remote appearance, nor did he indicate a desire to be present in the courtroom. There is not any allegation before us that this claim by trial counsel, as conveyed in the e-mail, was inaccurate or later withdrawn by Caril, and there is no assertion of ineffective assistance of counsel based on this communication by counsel on Caril's behalf. Caril further notes that he was not copied on the e-mail chain that his counsel initiated with the court and DOC and only now says he did not consent to his remote appearance at the hearing.

Criminal defendants have "a constitutional right to be present at sentencing, including resentencing." *State v. Rupe*, 108 Wn.2d 734, 743, 743 P.2d 210 (1987). However, this right can be waived expressly or by the failure to object and trial courts are "not required to probe into the issue of whether the defendant is voluntarily waiving

the right to presence if no objection is made." *State v. Anderson*, 19 Wn. App. 2d 556, 561, 497 P.3d 880 (2021), *review denied*, 199 Wn.2d 1004 (2022).

Here, not only did Caril not object to appearing remotely at resentencing, but he explicitly requested a remote hearing through his counsel. Caril now asserts for the first time, in his reply brief, that there was a breakdown in communication between him and his attorney. However, to the extent he asserts that he was deprived of counsel by the court's failure to inquire into a possible breakdown in communication between Caril and his public defender, we do not consider arguments raised for the first time in reply. *See Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Caril also contends that he did not know that he was waiving his right to an in-person hearing, which expressly contradicts the assertion of his attorney. Caril did mail several letters to the court and prosecutor wherein he expressed dissatisfaction with his counsel, stating his attorney was "not negotiating any court strategies with [him]" and "will not simply agree with legal reformed law already passed." Among the concerns Caril raised were his belief that he was due to be released from prison soon, claims of a double jeopardy violation, and other matters unrelated to the resentencing hearing. However, none of Caril's letters contained a request to appear in person at his resentencing hearing.

Caril fails to demonstrate that his counsel did not have authority to speak on his behalf when he communicated Caril's request to appear by Zoom for the resentencing hearing to the court and prosecutor. Caril's letters only establish that he was concerned with the fact that his counsel could not "simply agree" with information

regarding the "legal reformed law" or that his attorney refused to believe that he had already signed release papers in DOC. Furthermore, he did not ask for the opportunity to confer with his counsel, nor did he express any concerns about his ability to speak with his counsel privately. Instead, when he addressed the court, he spoke at length about his juvenile convictions, concerns about a violation of double jeopardy, experience in prison, and readiness for release. The court interrupted Caril once during his allocution to assure him that his juvenile convictions did not play a role in determining his offender score for resentencing.

Division Three of this court recently addressed a similar challenge in *Anderson*. Anderson averred that both his rights to be present and to counsel were violated when he appeared for resentencing by video from prison. *Anderson,* 19 Wn. App. 2d at 561. However, on review, this court expressly noted that not all constitutional errors are subject to the manifest constitutional error standard that allows a defendant to present the issue for the first time on appeal and concluded that Anderson failed to preserve the error because he did not object in the trial court. *Id.* at 561-62. While we agree that sentencing is a critical stage of proceedings and the defendant has a right to be present, we disagree that, as Caril suggests in briefing, established law requires a particular colloquy or written waiver if the defendant wishes to appear remotely.[4] Caril's express request to appear remotely at his resentencing hearing waived any challenge based on his right to appear in person.

---

[4] Caril appears to conflate CrR 3.4(a), which permits a *defendant's appearance through counsel* only upon written waiver or by oral or written affirmation on the record of that desire, with CrR 3.4(e)(2) that expressly allows *remote appearance by the defendant* "by agreement of the parties, either in writing or on the record, and upon approval of the trial court judge pursuant to local court rule." Here, Caril's attorney did not appear on his behalf under CrR 3.4(a), but rather Caril appeared remotely pursuant to CrR 3.4(e)(2) and the latter rule does not require a written waiver from the defendant. Caril offers no authority that his trial counsel's assertion of his request via e-

Woven throughout Caril's argument on this issue is an additional claim that his inability to confer with counsel effectively during the hearing deprived him of counsel. He argues this was structural error that is not subject to harmless error analysis. However, *Anderson* is instructive on this question as well. As a preliminary matter, the court in *Anderson* reached this assignment of error after concluding that Anderson had demonstrated that it was manifest constitutional error under RAP 2.5. *Id.* at 563-64. This necessarily means that Anderson established that the error was manifest; he was prejudiced by it. Division Three then proceeded to harmless error analysis, expressly undercutting Caril's assertion that such an error is structural. *Id.* at 564; *see also State v. Schlenker*, No. 39499-9-III, slip op. at 30-31, (Wash. Ct. App. Aug. 15, 2024), https://www.courts.wa.gov/opinions/pdf/394999_%20ord.pdf. In *Anderson*, the court determined that the State had carried its burden to prove that the violation of Anderson's right to counsel based on his inability to confer with his attorney was harmless beyond a reasonable doubt because the trial court granted Anderson's sentencing requests. 19 Wn. App. 2d at 564.

Here, Caril presented questions about inclusion of his juvenile points, double jeopardy, prison placement, and a number of other matters either already addressed or not properly before the trial court. Defense counsel argued for an exceptional sentence below the standard range based on Caril's documented history of significant mental health diagnoses and the failed diminished capacity defense presented at trial. The court had either already addressed the issues Caril wanted it to consider, particularly as to his offender score and concerns about a double jeopardy violation,

_____

mail, and subsequent communication between the parties and court about the logistics, was not a written agreement of the parties under CrR 3.4(e)(2).

or was without the authority to provide relief, as was the case with his assertion that he had already signed release paperwork at DOC. While the court did not impose a sentence below the standard range, it did not include his juvenile convictions in calculating Caril's offender score, nor was he punished twice for the same criminal act in violation of the constitutional prohibition on double jeopardy. Like Anderson, Caril does not show what other relief the trial court may have granted if he had been able to privately confer with counsel at sentencing. As such, any error in failing to expressly provide for procedures for such confidential communication was harmless.[5] Caril has failed to carry his burden on this challenge.

B.    Right To Appear for Proceedings Free from Restraints

Next, Caril relies on *State v. Luthi* to assert that conducting a resentencing hearing while he appeared remotely from prison constituted an unnecessary restraint that violated due process. 3 Wn.3d 249, 549 P.3d 712 (2024). According to Caril, videoconferencing from prison was "the same as appearing before the court with unjustified restraints." We disagree.

"A defendant's right to appear in court free from unjustified restraints is well established as a matter of federal and state due process law." *State v. Luthi,* 3 Wn.3d 249, 256, 549 P.3d 712 (2024); *see also State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). This right, however, can be limited if "'some impelling necessity demands the restraint.'" *State v. Lundstrom*, 6 Wn. App. 2d 388, 393, 429 P.3d 1116

---

[5] We take this opportunity to reiterate to trial courts that CrR 3.4(e)(3) establishes the standards for video appearances for hearings, which include the ability of a defendant to privately confer with counsel. Best practices for judges conducting hearings where the defendant appears remotely includes expressly setting out those procedures on the record and confirming understanding by the parties.

(2018) (quoting *State v. Williams*, 18 Wash. 47, 51, 50 P. 580 (1897); *see also State v. Damon*, 144 Wn.2d 686, 690-91, 25 P.3d 418 (2001). Thus, before restraining a defendant, "[a] trial court *must* engage in an individualized inquiry into the use of restraints prior to every court appearance" and determine whether the restraints are necessary. *Jackson*, 195 Wn.2d at 854; *see also State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981).

*Luthi* involved a defendant who appeared in court for a probation violation hearing while inside a cage-like holding cell within the jail courtroom in Cowlitz County. 3 Wn.3d at 251. In that case, Luthi's appearance for her hearing from within the secure cell was visible to the judge, the attorneys, and all courtroom observers, and it was precisely that visibility that eroded her constitutionally protected presumption of innocence. 3 Wn.3d at 264. Unlike the facts of *Luthi*, Caril appeared via Zoom from prison at his own request as conveyed to the court by his counsel. On the contrary, the record here reflects that Caril was waving his hand during the hearing in order to draw the attention of the judge, which at least suggests that his hands were not restrained. Caril does not provide any citations to the record to establish that he was shackled, caged, or otherwise physically restrained during his resentencing hearing beyond the fact that he was incarcerated. The extreme circumstances of *Luthi* are distinct from those of Caril's resentencing hearing and we have recently refused other attempts to conflate physical restraint with video appearances in court.

In a recent unpublished opinion of this court, *State v. Martin*,[6] the defendant similarly argued that remote appearance from prison for resentencing constituted impermissible shackling and relied on our Supreme Court's opinion in *Jackson*. In rejecting Martin's contention, we stated the following:

> The court's analysis in *Jackson* began with a review of the historical restrictions on shackling incarcerated individuals with irons, chains, manacles, and bonds. [195 Wn.2d] at 850-51. Prior to 1722, when prisoners were arraigned or entering a plea, they were not shackled "'unless there was evident danger of [their] escape,'" and by the late 1800s, our Supreme Court expressly held that shackling defendants was prohibited without an individualized determination of its necessity. *Id.* at 851 (quoting *Williams*, 18 Wash. at 49). Despite this, our Supreme Court noted, the practice of systematically restraining all incarcerated defendants had continued in certain trial courts in our state. *Id.* Looking beyond the problems of shackling within the courtroom, the court then painted a vivid picture of the role that shackling has played in the history of our country as a "means of control and oppression":
>
>> Shackles and restraints remain an image of the transatlantic slave trade and the systematic abuse and ownership of African persons that has endured long beyond the end of slavery. Shackles and restraints also represent the forced removal of Native people from their homelands through the Trail of Tears and the slave labor of Native people. We recognize that although these atrocities occurred over a century ago, the systemic control of persons of color remains in society, particularly within the criminal justice system.
>
> *Id.*
>
> We are unmoved by the attempt here to conflate the uniquely complex history of shackling with technological advances which allow incarcerated people to attend court proceedings without having to endure the physical and logistical hardships of the often byzantine process of prison transport. The analysis in *Jackson* was clearly rooted in the imagery and impact of restraints, bindings, and irons, which were complicated by a history of violent colonial practices. Martin does not even attempt to demonstrate which, if any, of these concerns are present here to trigger the application of *Jackson* as controlling authority. The record does not establish that Martin was bound,

---

[6] No. 84175-1-I, slip op. (Wash. Ct. App. Oct. 9, 2023) (unpublished), https://www.courts.wa.gov/opinions/pdf/841751.pdf. We cite this case pursuant to GR 14.1(c) as necessary for a reasoned opinion.

chained, handcuffed, or braced. He video conferenced into the court proceedings from prison.

*Martin,* slip op. at 16-17 (one alteration in original). We adopt the reasoning articulated in *Martin* as we remain unmoved by this attempt to apply the case law regarding physical restraint to circumstances where the defendant requested remote appearance by video. Caril has failed to carry his burden of establishing a due process violation on this basis.

II.     Proof of Prior Convictions for Calculation of Offender Score

The court determined that Caril's sentencing range was 298-397 months based on its calculation of his offender score as 10. After hearing from both the State and defense, it imposed a standard range sentence of 360 months in prison, followed by a mandatory consecutive term of 24 months in prison based on the deadly weapon enhancement, for a total term of 384 months of incarceration. Caril argues that the court erred by failing to reexamine the State's proof of his offender score. He requests a new sentencing hearing and claims that the sentencing court failed to hold the State to its burden of proving Caril's criminal history by a preponderance of the evidence and did not review any documents proving the alleged criminal history. We disagree.

The State indeed bears the burden of proving a defendant's criminal history by a preponderance of the evidence. RCW 9.94A.500(1). At the original sentencing hearing on January 29, 2021, the court made an explicit finding that the State had met its burden to prove Caril's prior convictions by a preponderance of the evidence. The court stated:

> Okay. So based on the preponderance of evidence standard which is—I would apply at this stage of the proceedings, I am going to

find that the State has established by a preponderance of the evidence that the Exhibit No. 2, the known print card that was taken on November 20th, is the same person as the prints that are contained in Exhibits 4, 5, and 7. And again, that those match up, it is the same person, and again that's pursuant to the preponderance of the evidence standard.

The trial court reached this conclusion after the State presented certified copies of Caril's prior J&Ss. The State also provided fingerprint comparison evidence and testimony, both of which, the court found, linked those convictions to Caril. Additionally, Caril's counsel expressly stated that he did not object to admission of certified copies of Caril's prior convictions as exhibits 4, 5, 6, and 7 as shown in the trial transcript:

[State]: Four is a judgment and sentence, 97-C-08696-1.

The Court: Is that 4?

[State]: That's No. 4. I think I'll just list them and then I'll offer them later because I think [defense counsel] is going to object to all of them. No. 5 is a certified judgment and sentence, 98-1-00166-1, Snohomish County. No. 6 is a certified docket from Everett Municipal Court, CR-0049895. And Exhibit 7 is a certified judgment and sentence, 02-1-0501504, Seattle.

[Defense counsel]: Did [c]ounsel say all of them were certified?

[State]: Yes.

[Defense counsel]: I have no objection if they're certified documents.

The Court: Okay. So as far as 4, 5, 6, and 7 are concerned, those are admitted, there is no objection.

Citing *State v. Hunley*, Caril obfuscates the issue by claiming that the court violated his right to due process by resting the sentence after remand on the State's bare assertions about his criminal history. 175 Wn.2d 901, 915, 287 P.3d 584 (2012). He properly asserts the State is not relieved of its burden to prove prior convictions unless he "affirmatively acknowledged" the "facts and information" underlying his

- 13 -

criminal history. *Id.* at 912-13. However, Caril's challenge on this issue is premised on his claims that the court did not calculate his offender score at the original sentencing hearing when it found he was subject to the persistent offender accountability act and that it did not reexamine the validity of the previously admitted exhibits or require the State to produce evidence of his criminal history again at resentencing.

The record clearly establishes, though, that both the accuracy and sufficiency of the State's proof of Caril's criminal history was fully litigated during his original sentencing before the same judge with the same defense attorney. Moreover, while Caril's attorney did not object to the admission of certified copies of Caril's previous J&Ss, prior to the State's presentation of evidence of their foundation, defense counsel *did* object to the admission of certain fingerprint cards that the State ultimately used to connect the documentation of those convictions to Caril. In fact, the State presented live testimony from an identification technician employed by the Seattle Police Department for that purpose and Caril's attorney raised a number of objections during her direct examination by the State. He further engaged in extensive cross-examination of the State's witness and presented substantive argument that the State had not carried its burden to prove Caril's criminal history. Any claim now presented on appeal that Caril's history was not fully litigated in this case or that the State was not held to its burden to prove that history by a preponderance of the evidence is belied by the record. Caril provides no authority to support his assertion that the trial court was required to re-examine and re-calculate his offender score at resentencing after comprehensive re-litigation and renewed fact-finding.

Caril further asserts that the court was obligated to determine whether his juvenile convictions affected his offender score. Caril contends a third resentencing is required because the court's failure to conduct this specific inquiry left him without the necessary assurances that invalid convictions, or convictions that should not be scored, did not impact his sentence. This challenge, however, is futile. Caril's juvenile convictions were neither included nor referenced in calculating his offender score at his resentencing as demonstrated by appendix B to his J&S which includes only convictions for adult felonies:

## SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

STATE OF WASHINGTON,

Plaintiff,

vs.

LEON CARIL, II,

Defendant.

No. 17-1-04489-6 SEA

JUDGMENT AND SENTENCE, (FELONY) - APPENDIX B, CRIMINAL HISTORY

**2.2 The defendant has the following criminal history used in calculating the offender score (RCW 9.94A.525):**

| Crime | Sentencing Date | Adult or Juv. Crime | Cause Number | Location |
|-------|-----------------|--------------------|--------------|----------|
| Attempted Robbery In The First Degree | 11-22-2002 | AF | 02-1-05015-4 | King Superior Court WA |
| robbery 2nd | 03-06-1998 | AF | 97-1-08696-1 | King Superior Court WA |
| robbery 2nd | 03-06-1998 | AF | 97-1-08696-1 | King Superior Court WA |
| robbery 2nd | 03-06-1998 | AF | 97-1-08696-1 | King Superior Court WA |
| robbery 2nd | 03-06-1998 | AF | 97-1-08696-1 | King Superior Court WA |

| | The following prior convictions were counted as one offense in determining the offender score (RCW 9.94A.525(5)):

Date: 4/7/23

JUDGE, KING COUNTY SUPERIOR COURT

Patrick H. Oishi

III.     Finding of Indigency and Legal Financial Obligations

In light of the trial court's finding of indigency, Caril challenges the imposition of certain legal financial obligations (LFOs).

A.     VPA

The legislature passed Engrossed Substitute House Bill 1169, which amended the VPA statute effective July 1, 2023.  *See State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d 1048 (2023) (citing LAWS OF 2023, ch. 449).  The statute now prohibits courts from imposing costs on defendants found to be "indigent" as defined by RCW 10.01.160(3), and requires the trial court to waive any costs imposed before the effective date, on the defendant's motion, if the defendant is unable to pay.  RCW 7.68.035(4), (5)(b).  Although the amendments took effect after Caril's resentencing hearing, they apply prospectively to cases that are on direct review.  *Ellis*, 27 Wn. App. 2d at 16.

The parties agree that Caril is indigent but the State argues that the VPA is not a "cost" within the meaning of RCW 10.01.160(3).  The State is incorrect.  We remand for the trial court to strike the VPA from Caril's J&S.

B.     Interest on Restitution

Caril also asserts that the trial court erred when it imposed interest on restitution, given both his indigency and history of mental health diagnoses.  The recent revisions to RCW 10.82.090(2) eliminate the mandatory imposition of interest on restitution.  LAWS OF 2022, ch. 260, § 12.  The sentencing court now has the discretion to waive interest based on factors such as indigency, mental

illness, and homelessness. *Id.* The court may also consider any other relevant information that may influence the decision to not impose interest on restitution in the interest of justice. *Id*.

The State asserts that Caril's contention is based on misreading of the procedural history of the case with respect to the effective date of the amendment. We disagree. Restitution interest was imposed on Caril in the J&S entered on April 7, 2023 and the amendment to RCW 10.82.090 took effect on January 1, 2023. The State contends that Caril's failure to object when the court did not appear to apply the statutory amendments and consider the factors for the imposition of interest on restitution, waived the issue for purposes of appeal. Our Supreme Court clearly stated in *State v. Blazina* that unpreserved challenges to discretionary LFOs are not reviewable as a matter of right under case law. 182 Wn.2d 827, 833-34, 344 P.3d 680 (2015). The amendment to the statute at issue expressly made interest on restitution discretionary, but also affirmatively requires the court to consider a number of factors prior to its imposition. The record demonstrates that the trial court erred when it failed to properly apply RCW 10.82.090 before imposing interest on restitution and we have held that defendants were entitled to relief even in cases where sentencing occurred and interest was imposed prior to the effective date of the amendment. *See State v. Schultz*, 31 Wn. App. 2d 235, 256, 548 P.3d 559, *review denied*, 3 Wn.3d 1022 (2024); *State v. Reed*, 28 Wn. App. 2d 779, 782, 538 P.3d 946 (2023), *review denied*, 2 Wn.3d 1035 (2024). Accordingly, we direct the court, upon remand to strike the VPA, to

consider whether the imposition of interest on restitution is proper here after reviewing the statutory factors regarding indigency and mental health diagnoses.

IV.     Statement of Additional Grounds for Review

A defendant may provide a pro se statement of additional grounds (SAG) for review.  RAP 10.10(a).  However, there are practical limitations to our review of a SAG.  For example, "an appellate court will not consider an argument made in a [SAG] if it does not inform the court of the nature and occurrence of the alleged errors."  *State v. Alvarado,* 164 Wn.2d 556, 569, 192 P.3d 345 (2008).  "Although reference to the record and citation to authorities are not necessary or required, the appellate court will not consider an appellant's SAG if it does not inform the court of the nature and occurrence of alleged errors."  *State v. Gauthier*, 189 Wn. App. 30, 43-44, 354 P.3d 900 (2015).  "[I]ssues that involve facts or evidence not in the record are properly raised through a personal restraint petition, not a statement of additional grounds."  *Calvin*, 176 Wn. App. at 26.  However, issues addressed on direct appeal may not be renewed in a personal restraint petition, unless certain specific requirements are met.  *See* RAP 16.4(d); *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 501-04, 681 P.2d 835 (1984).

Caril submitted his SAG three times, with each submission containing slight differences.  He raised a total of 27 additional grounds, spanning from alleged miscalculation of his offender score and earned release date to requests for money damages and challenges to prior arrests on other cases, with several duplicate or overlapping requests for relief.  We endeavor to address the claims as we understand them.

A.    Calculation of Offender Score

Caril challenges the inclusion of his juvenile conviction and alleges miscalculation of his offender score in SAG issues 12, 22, and 24.  While Caril clearly disagrees with the trial court's calculation of his offender score, he has not shown a sufficient basis to question its accuracy.  He is not entitled to relief on these issues.

B.    Matters Outside Scope of Appeal

Caril raises a number of issues that are outside of the scope of the present appeal.  In SAG issues 13, 17, 19, and 21, he expressly requests investigation of his juvenile arrests and convictions.  Such matters are clearly beyond our limited review of the resentencing hearing in this case.  As a preliminary matter, the only case before us on direct appeal is King County Superior Court No. 17-1-04489-6 SEA.  Further, appellate courts "cannot reweigh the evidence on review." *State v. Ramos*, 187 Wn.2d 420, 453, 387 P.3d 650 (2017).  It is worth reiterating here that Caril's juvenile convictions were not considered in the calculation of his offender score in this case.

Caril separately challenges the imposition of LFOs in those juvenile cases in SAG issue 13, asserting that he has paid thousands of dollars in interest, over and above the fines themselves, from 1996 to 2023.  Again, those cases are not properly before this court.  To the extent that this SAG issue is a request to remit any remaining LFOs in those cases, that procedure is addressed in part G below.

C.     Issues Already Addressed in Previous Direct Appeal

In SAG issue 5, Caril challenges the evidence underlying his conviction. However, his conviction was affirmed in his previous appeal; the only aspect of the case that was reversed was the sentence. *State v. Caril*, 23 Wn. App. 2d 416, 436, 515 P.3d 1036, 1046 (2022), *review denied*, 200 Wn.2d 1025, *cert. denied sub nom. Caril v. Washington*, 144 S. Ct. 125 (2023). Again, the only matter before this court is the resentencing hearing. We do not consider renewed challenges to the conviction that were addressed in a prior appeal. *See State v. Clark*, 143 Wn.2d 731, 745, 24 P.3d 1006 (2001) ("'Where there has been a determination of the applicable law in a prior appeal, the law of the case doctrine ordinarily precludes redeciding the same legal issues in a subsequent appeal.'" (internal quotation marks omitted) (quoting *Folsom v. County of Spokane*, 111 Wn.2d 256, 263, 759 P.2d 1196 (1988))).

D.     Sentencing Requests

Caril additionally makes several requests that appear to relate to the terms of the sentence that was imposed. In SAG issue 3, he requests assignment to a work camp; in SAG issue 8, he seeks to substitute a portion of his prison time with community custody; in SAG issue 9, he requests placement in a work release program; in SAG issue 11, he requests placement in a mental health facility; and in SAG issue 25, he asks for an extension of his term of community custody supervision. As an appellate court, we are tasked with analyzing the legal propriety of Caril's resentencing; we do not have the authority to direct a sentencing court to authorize alternatives to confinement like those sought here.

E.      Requests for Other Remedies Not Available from This Court

Caril also seeks other forms of relief that are not available on appeal.  In SAG issues 2, 7, 14, 20, and 26 he seeks immediate release from prison and money damages for false imprisonment based on a number of claimed irregularities from the purported inclusion of his juvenile convictions in the calculation of his offender score to false imprisonment and scrivener's errors.  Absent circumstances not present here, this court will not direct immediate release from custody.  *See, e.g.,* RAP 16.15(b); *In re Pers. Restraint of Pauley*, 13 Wn. App. 2d 292, 309, 466 P.3d 245, 254 (2020); Ruling Granting Rev., *In re Pers. Restraint of Williams*, No. 99344-1, at 4-5 (Wash. Feb. 3, 2021).  In SAG issue 27, he requests assistance in filing a suit for damages against prior trial and appellate counsel.  There no right to counsel for purposes of filing a claim for money damages against counsel or others as a result of a criminal conviction.  "'[T]he Sixth Amendment right to counsel, while fundamental, is not a right without limitation.'"  *State v. Afeworki*, 189 Wn. App. 327, 330, 358 P.3d 1186 (2015) (alteration in original) (internal quotation marks omitted) (quoting *Bailey v. Commonwealth*, 38 Va. App. 794, 803, 568 S.E.2d 440 (2002)).  In SAG issue 6, he further requests that this state court order his transfer to a federal prison.  Apart from the inconsistency between this request and the one for immediate release, the doctrine of separation of powers limits the authority of this court with regard to conditions of incarceration, such as placement in particular facilities or programs, and Caril cites no authority that would allow a state appellate court to direct a federal prison to accept a person serving a sentence for a violation of state law.

Caril also argues in SAG issue 16 that counsel failed to monitor his LFOs, but he offers no authority that appointed counsel must track payment or collection efforts on LFOs after their representation has concluded or on cases where they were not appointed.

In SAG issue 1, Caril claims that his earned release date was miscalculated, while in SAG issues 15 and 18, he seeks placement in mental health housing and an evaluation for housing and placement purposes. Additionally, in SAG issue 23, Caril requests consideration for work programs. These appear to be inquiries better directed at DOC as they pertain to internal prison procedures or determinations regarding housing or access to programs. Decisions by DOC regarding access to resources like health care or programs may be reviewed by personal restraint petition. *See In re Pers. Restraint of Williams*, 198 Wn.2d 342, 496 P.3d 289 (2021); RAP 16.4.

F.      Unsupported or Unclear Claims

Caril additionally raises several issues that are either unclear, beyond the scope of relief we can provide, or both. In SAG issue 4, Caril claims tribal membership and appears to assert that he is entitled to "sovereign immunity" as a result. Because this claim is not supported by credible evidence in the record, we cannot review it. See RAP 10.10(c) (appellate court will not consider argument made in a SAG if it does not inform court of nature and occurrence of alleged errors). Additionally, in SAG issue 10, he argues that the interstate compact for adult offender supervision (ICAOS)[7] applies to him. However, ICAOS addresses

---

[7] RCW 9.94A.745

terms of supervision after release from prison, so it is unclear how this would apply given Caril's current custodial status. As presented, these issues are impermissibly vague and do not provide a valid basis for the relief he seeks. Accordingly, we decline to analyze them further.

G.      Motion to Remit LFOs

Caril includes in his SAG a motion to remit certain LFOs. However, the plain language of the statute that authorizes such a motion directs that it be made in the trial court. RCW 10.01.160(4) states that a "defendant who has been ordered to pay costs and who has not willfully failed to pay the obligation . . . may at any time petition *the sentencing court* for remission of the payment of costs or of any unpaid portion thereof." (Emphasis added.) Accordingly, motions to remit LFOs on any of Caril's past convictions should be made in the corresponding sentencing court.

We affirm in part, reverse in part and remand for the trial court to strike the VPA and consider the statutory factors regarding the imposition of interest on restitution.

WE CONCUR:

Díaz, J.                              Mann, J.

- 23 -